Debra BLACK, Plaintiff–Appellee,

v.

ZARING HOMES, INC., Defendant–Appellant.

No. 96–3118.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 14, 1996.

Decided Jan. 14, 1997.

Donald B. Hordes (argued and briefed), Schwartz, Manes & Ruby, Cincinnati, OH, for Plaintiff–Appellee.

Deborah S. Adams (argued and briefed), Frost & Jacobs, Cincinnati, OH, for Defendant–Appellant.

Jennifer S. Goldstein (argued and briefed), Equal Employment Opportunity Commission, Office of the General Counsel, Washington, DC, for Amicus Curiae Equal Employment Opportunity Commission.

Before: KENNEDY and BATCHELDER, Circuit Judges; EDGAR *, District Judge.

KENNEDY, Circuit Judge.

In this action under Title VII, 42 U.S.C. § 2000e *et seq.*, defendant appeals both the jury's verdict in favor of plaintiff and the magistrate judge's denial of its post-trial motion for judgment as a matter of law or, in the alternative, for a partial new trial or remittitur. The jury found that while plaintiff was an employee of defendant, she was subjected to sexual harassment in the form of a hostile work environment. The jury awarded plaintiff $50,000 in compensatory damages and $200,000 in punitive damages. Defendant first argues that it is entitled to judgment as a matter of law because no reasonable interpretation of the evidence supports a finding of a hostile work environment. In the alternative, defendant asserts that (1) no justification exists for an award of punitive damages and (2) the magistrate judge erred in denying its motion for a new trial.[1] For the following reasons, we REVERSE.

## I. Facts

■ Defendant is in the business of acquiring and developing land and building and selling homes. Plaintiff started working for defendant as Land Acquisition Manager on June 29, 1993. Her job entailed identifying pieces of land suitable for neighborhood development and working toward getting that land under contract to purchase. Her duties required that she be out of the office and in the field seventy percent of the time.

Every two weeks, employees of defendant's land department attended "land meetings" to discuss the status of acquisition efforts. Besides plaintiff, attendees included Jeff Hebeler, plaintiff's immediate supervisor; Ronald Benkert, defendant's then-President; Michelle Grigsby, Vice President and in-house General Counsel; Tim Zaring, Rick Iannitti, Tim Kramer, and Doug Hinger, the managers in charge of defendant's four product lines of homes; Jeff Hafer, development manager; and Mark Stenger, land development administration manager. Plaintiff asserts that sexually harassing comments were made at many of these meetings.

Sometime at the end of July, plaintiff was in a land meeting, sitting next to Tim Zaring. Zaring reached over to take a pastry from a plate in the center of the table and in front of plaintiff, and he said, "Nothing I like more in the morning than sticky buns," while looking plaintiff up and down, smiling, and "wriggl[ing]" his eyebrows. Plaintiff asserts that she reacted by saying "Tim, cut it out," whereafter Zaring turned to Iannitti, who was sitting on his other side, and laughed. Zaring's comment "bothered [plaintiff] a little bit."

At the next land meeting, sometime in mid-August, the meeting participants discussed a parcel of land adjacent to a Hooters Restaurant. Someone suggested that the area be named "Hootersville," and Zaring and Iannitti suggested "Titsville" or "Twin

---

* The Honorable R. Allan Edgar, United States District Judge for the Eastern District of Tennessee, sitting by designation.

1. Defendant sought a new trial on grounds that the magistrate judge erred in admitting certain evidence, including, as evidence of a hostile work environment, evidence of two incidents that occurred after plaintiff left defendant's employ and that did not involve plaintiff. Defendant also asserted that the jury instructions were improper and inaccurate. Defendant has raised substantial claims with regard to these assignments of error, but we decide the case on other grounds.

Peaks." Everyone at the meeting laughed. Plaintiff says she "looked down, and . . . was devastated by this thinking this is going to continue on . . . an ongoing basis." According to plaintiff, jokes about this particular parcel of land occurred at numerous meetings. Her ability to work was affected because she would worry that any remark she might make would "throw everybody off for awhile."

Also in August, plaintiff went to Hebeler to discuss her job performance and to ask about how her bonus would be affected by the number of parcels of land she acquired. Hebeler responded by telling plaintiff that she was "paid great money for a woman." Plaintiff was "deeply upset" about the comment.

In September, plaintiff was negotiating to purchase a parcel of land owned by an individual named "Dr. Paul Busam," apparently pronounced "bosom." Plaintiff gave a presentation regarding the parcel at a land meeting and, when she mentioned the owner's name, everyone laughed. Some participants, although plaintiff could only specifically name Iannitti, began joking again about the possible names for the property near the Hooters Restaurant. In order to avoid such laughter and joking at subsequent meetings, plaintiff would refer to the owner as "Dr. Paul."

At a land meeting in October, when plaintiff asked about the location of a particular property, Benkert told her that it was near a biker bar. He then said, "Say, weren't you there Saturday night dancing on the tables?" Plaintiff testified that everyone laughed and that she was "hurt," "crushed," and "devastated" by the remark because "it was making a characterization of [her]." After the remark, plaintiff looked down and quietly said, "Not hardly, Ron," but she did not believe that anyone heard her.

Finally, sometime in October, plaintiff was sitting next to Hebeler, waiting for a land meeting to start, when she heard him tell Hafer, "Just get the broad to sign it." This comment was made supposedly in response to Hafer telling Hebeler that he was having problems getting a county official to sign a document. Plaintiff says that she immediately looked at Hebeler and that he looked at her and shrugged his shoulders. She then shook her head.[2]

Plaintiff testified that she complained to Michelle Grigsby, defendant's general counsel, sometime at the end of the summer. Their discussion took place in the women's restroom after a land meeting. Plaintiff says she told Grigsby: "I can't stand this in this land meeting. This is crazy. It's gotten way out of hand. Has it always been like this?" Grigsby responded: "Well, that's just the way they are. . . . There's nothing you can do about it." Plaintiff then said: "Except that it takes up so much time. It doesn't make sense to spend quality business time to get our business done for them to go off on these little tangents and little schoolboy activities laughing and joking."

Plaintiff was terminated for performance deficiencies on November 8, 1993, a little over four months after she started working for defendant. On April 4, 1994, she filed a charge of sex discrimination with the Equal Employment Opportunity Commission (EEOC). Plaintiff received a right to sue notice on or about June 9, 1994. She then sued defendant alleging sex discrimination, sexual harassment, breach of contract, and the intentional infliction of emotional distress. She asserted claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as well as claims under the comparable state statute, OHIO REV. CODE § 4112.02(A) (Anderson 1991), and Ohio common law. The parties agreed to have the case tried by a magistrate judge. Plaintiff dismissed the breach of contract claim, and the magistrate judge directed a verdict in

---

2. Defendant includes in its list of alleged incidents of harassment an event that occurred in mid-August at a farewell party for an employee of defendant: Allen Zaring, defendant's chief executive officer, invited plaintiff and Michelle Grigsby to sit by him, saying "I love to be surrounded by beautiful women." Plaintiff says she was not offended by this remark, but that she was offended by the "look" she received from an unidentified woman. Plaintiff does not include this event in her appellate brief. The magistrate judge found that "this isolated incident did not constitute, nor did it contribute to a sexually hostile and abusive environment."

defendant's favor on plaintiff's emotional distress claim.

On March 31, 1995, the jury rendered a verdict against plaintiff on her claim of sex discrimination related to her termination, but in favor of plaintiff on her claim of sexual harassment based on a hostile work environment. The jury awarded $50,000 in compensatory damages and $200,000 in punitive damages. Judgment on this verdict was entered on September 21, 1995.

Defendant timely filed a renewed motion for judgment as a matter of law or, in the alternative, for a partial new trial on the sexual harassment claim or remittitur. The magistrate judge denied defendant's motions. The magistrate judge found that the evidence revealed "an atmosphere of a grade school level fascination with women's body parts combined within [sic] denigrating comments about women" which were "not appropriate in the workplace." Acknowledging that "[t]he more difficult question is whether this conduct was sufficiently offensive and occurred often enough to create an objectively and subjectively hostile and abusive working environment," the magistrate judge held that the evidence supported such a finding.

The magistrate judge also denied defendant's motion for a new trial, finding that (1) the verdict was not against the clear weight of the evidence; (2) its evidentiary rulings were not prejudicial to defendant; (3) the jury instructions were not misleading, inadequate, or prejudicial; and (4) the verdict did not shock the conscience. Finally, stating that the "propriety of a punitive damages award in this case is a close question," because plaintiff did not complain about many of the comments, the magistrate judge concluded that the jury could have determined that particular circumstances demonstrated reckless disregard for women's rights in general and plaintiff's rights in particular. Accordingly, the magistrate judge affirmed the judgment.

This timely appeal followed.

## II. Discussion

### A.

This Court's standard of review for a FED. R.CIV.P. 50(b) motion for judgment as a matter of law based on the sufficiency of the evidence is identical to that used by the District Court. *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir.1996). Thus, we do not weigh the evidence, evaluate the credibility of the witnesses, or substitute our judgment for that of the jury. *Id.* at 175–76; *Wehr v. Ryan's Family Steak Houses, Inc.*, 49 F.3d 1150, 1152 (6th Cir.1995). Instead, we must view the evidence in the light most favorable to the party against whom the motion was made, and give that party the benefit of all reasonable inferences. *K & T Enters., Inc.*, 97 F.3d at 176. We reverse a district court's denial of such a motion only if reasonable minds could not come to a conclusion other than one in favor of the movant. *Id.*

### B.

Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1). In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986), the Supreme Court held that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a hostile or abusive work environment. Indeed, the statute grants employees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Id.* at 65, 106 S.Ct. at 2405.

However, the Court emphasized in *Meritor* that not all workplace conduct that has sexual overtones can be characterized as harassment forbidden by the statute. *See id.* at 67, 106 S.Ct. at 2405–06. Rather, harassment must affect a "term, condition, or privilege" of employment in order for it to fall within Title VII's purview. Thus, for alleged harassment to be actionable, it must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982)).

In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–23, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993), the Supreme Court reaffirmed this standard and elaborated upon its contours. The *Harris* Court explained that the conduct in question must be judged by both an objective and a subjective standard: The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive. *Id.* at 21–22, 114 S.Ct. at 370–71. "This standard ... takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.* at 21, 114 S.Ct. at 370. Acknowledging that this approach is not susceptible to a "mathematically precise test," *id.* at 22, 114 S.Ct. at 371, the Court then sought to provide some guidance with regard to the somewhat elusive question of whether a work environment was objectively hostile or abusive. The Court explained that all of the circumstances should be considered, and it suggested a non-exhaustive list of relevant factors:

> [T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.* at 23, 114 S.Ct. at 371.

Defendant concedes that verbal conduct alone can be the basis of a successful hostile work environment claim. However, it asserts that such conduct must be objectively hostile or abusive before it can be legally proscribed. Defendant maintains that here the verbal conduct simply did not rise to that level and that therefore the evidence does not support a finding of sexual harassment.

■ We agree with defendant. Given the imprecise standard laid down by the *Harris* Court, we might be reluctant to overturn a jury verdict in favor of plaintiff. Nevertheless, although the comments were sex-based, we hold that the evidence is insufficient to support a finding that they were severe or pervasive enough to create an objectively hostile work environment.[3] Our conclusion is not based upon an analysis of the comments as isolated events. Rather, viewing the totality of the circumstances, *see Harris*, 510 U.S. at 23, 114 S.Ct. at 371, we find that even when construed in a light most favorable to the plaintiff, the conduct does not appear to have been more than "merely offensive," *id.* at 21, 114 S.Ct. at 370. While we emphasize that sex-based comments need not be directed at a plaintiff in order to constitute conduct violating Title VII, we note that in this case most of the comments were not directed at plaintiff; this fact contributes to our conclusion that the conduct here was not severe enough to create an objectively hostile environment. *See cf. Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525, 541 (1st Cir.1995) (finding that plaintiffs' allegations were not so severe as to create an objectively hostile educational environment under Title IX, in part because the sexual comments were not directed at the plaintiffs), *cert. denied*, —— U.S. ——, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996). Although the verbal comments were offensive and inappropriate, and the record suggests that defendant's employees did not always conduct themselves in a professional manner, Title VII was "not designed to purge the workplace of vulgarity," *Baskerville v. Culligan Internat'l Co.*, 50 F.3d 428, 430 (7th Cir.1995).

Although the EEOC in its amicus brief urges us to reject the court's analysis in *Baskerville*, we find that case helpful. In *Baskerville*, the Seventh Circuit overturned a jury verdict in favor of the plaintiff because it found that the facts were insufficient to support a finding of an objectively hostile work environment. *Id.* at 430. As in this case, the plaintiff's claim was based on verbal con-

---

**3.** Indeed, the magistrate judge commented that it "recall[ed] very few sexual harassment cases

tried in this court or in the case books where the conduct was that innocuous as in this case."

duct only.[4] The court found that the nine allegedly unlawful incidents, spread over seven months, could not reasonably be thought to constitute sexual harassment actionable under Title VII. *Id.* The court reached this conclusion not because the alleged harassment was based upon verbal conduct only, but because the conduct did not create an objectively hostile work environment.

The EEOC maintains that *Baskerville* improperly ignored the impact that offensive comments have in the context of the workplace, and that we should instead follow the reasoning of *Harris.* Yet, we do not believe that *Baskerville* is inconsistent with *Harris* or *Meritor.* The Supreme Court in both decisions recognized that there may be times when offensive comments have an impact in the workplace, indeed constitute "harassment", but do not create an objectively hostile work environment. *See Harris,* 510 U.S. at 21, 114 S.Ct. at 370; *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405–06. "[N]ot all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405. Our understanding of the analysis in *Meritor* and the standard set forth in *Harris* supports our finding that the record here does not establish an objectively hostile work environment. Accordingly, the verdict must be reversed.

### III. Conclusion

For the foregoing reasons, we REVERSE.

---

**4.** The plaintiff testified that over a period of seven months, her supervisor: (1) would call her "pretty girl"; (2) once made a grunting sound when she was wearing a leather skirt; (3) in response to her comment that it was hot in his office, said "Not until you stepped your foot in here"; (4) once, when an announcement "May I have your attention, please," was broadcasted over the public address system, said to plaintiff, "You know what that means, don't you? All pretty girls run around naked"; (5) called plaintiff a "tilly," explaining that he used that term for all women; (6) once told her that his wife had told him he had "better clean up my act" and "better think of [plaintiff] as Ms. Anita Hill"; (7) when asked why he had left the office holiday party early, replied that there were so many pretty girls there that he "didn't want to lose control, so I thought I'd better leave"; (8) once replied, after plaintiff commented that his office was smokey, "Oh really? Were we dancing, like in a nightclub?"; and (9) once made a movement suggesting masturbation in response to the plaintiff's question regarding whether he had bought his wife a Valentine's Day card. *Baskerville,* 50 F.3d at 430.