Sharon B. POLLARD, Plaintiff,

v.

E.I. DUPONT de NEMOURS, INC., Defendant.

No. 95–3010 M1/V.

United States District Court,
W.D. Tennessee,
Western Division.

Aug. 20, 1998.

Kathleen L. Caldwell, Taylor Halliburton Ledbetter Caldwell, Memphis, TN, Alayne B. Adams, Coiner Adams & Mackenzie, Memphis, TN, for Plaintiff.

Carl I. Jacobson, McKnight Hudson Lewis Ford & Harrison, Memphis, TN, for Defendant.

## MEMORANDUM OPINION AND ORDER

McCALLA, District Judge.

Plaintiff, Sharon Pollard, brought this suit against her former employer, alleging that she had been subjected to a hostile work environment because of her gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). A non-jury trial was held in this matter on October 14, 15, 16, and 24, and November 3 and 4 of 1997. For the reasons set forth below, the Court finds that plaintiff was subjected to a hostile work environment because of her gender, in violation of Title VII, and judgment is ENTERED in favor of plaintiff.

*FINDINGS OF FACT*

Plaintiff began her employment with defendant in 1977 as a utility worker in the utility pool. She was promoted to the position of assistant operator ("AO") in the oxone flouride area in 1978, and transferred to an AO position in the hydrogen peroxide area in 1979. In 1987, plaintiff was promoted to the position of operator in the hydrogen peroxide area. While plaintiff was working as an operator in peroxide, only one other woman was in an operator position in that area, and only two of the assistant operators were female. All of the other operators and assistant operators in the peroxide area were male.[1]

Plaintiff initially worked as an operator on "C" shift from 1987 to 1992. Each shift has three operators: the control room operator (or operator # 1), operator # 2, and operator # 3. Each operator has separate duties on the shift, and none of the operators is superior in rank to the others. The control room operator works in the control room, the # 2 operator works the south side of the area, and the # 3 operator works in the laboratory and in the water building. The three AOs that are assigned to each shift take direction from the operators. While plaintiff was working as the control room operator on "C" shift, an incident occurred during which an AO, Rory Bricco, refused to take direction from plaintiff. Mr. Bricco informed plaintiff that he could not take direction from a woman, and placed a Bible on her desk, opened to a passage which read, "I do not permit a woman to teach or have authority over a man. She must be silent."[2] Plaintiff subsequently transferred to a # 2 operator position on "A" shift in 1992.

In 1994, plaintiff had moved from the # 2 operator position to the # 3 operator position on "A" shift in the peroxide area. The other

---

1. Based on testimony at trial, the Court concludes that there are four different shifts ("A", "B", "C", and "D"), with approximately seven people on each shift. *See* Testimony of Mark Cobb ("Cobb's Test."), Trial Transcript ("Tr.") at 240. Accordingly, of the approximately twenty-eight employees on shifts in the peroxide area, only four were women.

2. The Court notes that this event occurred outside of the relevant time period in this case, which is from December 1994 to December 1995, and thus cannot form a basis for liability on the part of defendant. Because allegations involving this same Bible verse are properly before the Court, however, this event is included as context, as the Court finds that the fact that plaintiff had been previously exposed to this Bible verse while working in the peroxide area contributed to the intensity of her reaction when she saw it for the second time.

members of her shift were Steve Carney, Jerry Lee, Joey Moody, David Walker, and Mark Cobb. Carney was the control room operator, Lee was the #2 operator, and Cobb, Moody, and Walker were the three AOs on the shift. The shift supervisor at that time was David Swartz.

During 1992 and 1993, plaintiff and all of the other members of "A" shift got along well. Many of the witnesses testified that they viewed the shift as their "extended family." Members of the shift would cook and eat their meals together in the break room,[3] and would talk to each other regularly about their lives outside of work.

In February of 1994, however, the congenial atmosphere on "A" shift began to change. At that time, DuPont announced that it would be taking part, for the first time, in the nationally recognized "Take Your Daughters to Work Day" ("TYDTWD") in April of that year. Plaintiff, as one of two female operators in the entire peroxide area, was asked to give a talk about her job to some of the girls coming to visit the plant on that day, and she agreed to do so. A number of the men on "A" shift, particularly Steve Carney and Jerry Lee, were against TYDTWD, and made their displeasure with DuPont's decision to take part in this event widely known. A number of other men in peroxide, and throughout the plant, were against DuPont's participation as well. *See* Testimony of Jerry Lee ("Lee's Test."), Tr. at 495. One of these men, Paul Lucas, sent an email out to everyone in the plant regarding TYDTWD, referring to the event as "horse malarky."

Plaintiff had discussions with both Steve Carney and Jerry Lee regarding her participation in TYDTWD, and both men made clear that they were against it. Testimony of Sharon Pollard ("Pollard's Test."), Tr. at 627–28. Subsequent to those discussions, the atmosphere on the shift began to change. All of the men on the shift, with the exception of Mark Cobb, stopped eating with plaintiff and stopped talking to her. Cobb testi-

fied that Carney instructed the other men on the shift not to eat with plaintiff, not to share food with her, not to be in the break room with her, and not to talk to her. Cobb's Test. at 251, 273. Plaintiff testified as follows:

> [I]f I came into the lunchroom, nobody would sit down at the table with me. If I sat down at a table that someone was already sitting at, they would get up and leave....I heard a lot of under your breath kind of things...and snickering.

Pollard's Test., Tr. at 37. Cobb further stated that Carney instructed the other men on "A" shift not to follow any of plaintiff's instructions without checking with him first. Cobb's Test. at 251–52. Carney himself conceded that "[i]t's a possibility" that he told AOs on "A" shift to disregard plaintiff's instructions. *Id.* at 904.

It was common knowledge among the employees in the peroxide area that Steve Carney, Jerry Lee, Rory Bricco, and many of the other men in the area, did not approve of women working in peroxide. Cobb's Test., Tr. at 246–47, 251, 359, 361; Testimony of David Walker ("Walker's Test."), Tr. at 746–47. Mark Cobb testified that Carney would make comments to this effect approximately five times per week to the men on "A" shift, and Cobb and several other witnesses confirmed that Carney routinely referred to women as "bitches" and "cunts." Cobb's Test., Tr. at 264, 266; Lee's Test., Tr. at 491–92; Walker's Test., Tr. at 751–52.

Several witnesses testified that they had heard Carney use the word "heifer" to refer to women, and that use of the term "heifer" to refer to women in general was commonplace in the peroxide area. Testimony of Joey Moody ("Moody's Test."), Tr. at 697; Lee's Test., Tr. at 489–90; Walker's Test., Tr. at 723. Carney admitted that he referred to women as "heifers," and that he referred to plaintiff as a "bitch" and a "split tail." Testimony of Steve Carney ("Carney's Test."), Tr. at 908–09. In addition, DuPont

---

3. There were three separate eight hour shifts in the peroxide area: the 8:00 a.m. to 4:00 p.m. shift, the 4:00 p.m. to 12:00 midnight shift, and the 12:00 midnight to 8:00 a.m. shift. The employee break room included a small kitchen area

with a stove, refrigerator, and microwave, and, particularly on the evening and midnight shifts, members of "A" shift would divide up cooking duties and take turns bringing in food to allow them to eat together.

had a company-sponsored support group known as the Women's Network,[4] of which Carney routinely expressed his disapproval. Cobb's Test., Tr. at 246–47; *see also* Testimony of Kay Jenks ("Jenks' Test."), Tr. at 416 (noting that the men on plaintiff's shift did not approve of plaintiff attending the meetings of the Women's Network).

In May of 1994, after plaintiff had been experiencing the kind of isolation described above from the members of "A" shift for approximately two months, the shift supervisor, David Swartz, held a training meeting.[5] During the meeting, all of the members of "A" shift and Swartz were seated around a small conference table. At some point during a break in the meeting, Carney and Walker were having a discussion about a girls softball team, during which Carney said "that heifer can't coach," in reference to the woman who coached the team. Moody's Test., Tr. at 697. Carney also said something along the lines of "women have no business coaching." Moody's Test., Tr. at 677–78; Walker's Test., Tr. at 753; Lee's Test ., Tr. at 472–73; Pollard's Test., Tr, at 632. Plaintiff, who was sitting across the table from Carney, heard these comments, became very upset, and asked to be excused to go to the nurse's station. Pollard's Test., Tr. at 632–34.

Once she arrived at the nurse's station, plaintiff asked the nurse to call her supervisor, David Swartz, to come and speak with her. When Swartz arrived, plaintiff was very upset and began to cry. Swartz testified that she told him "that she couldn't take it any more, she was tired of people talking about women the way they do . . . [that Steve Carney had said] 'Well, that heifer can't coach,' . . . and she was just tired of them saying that women can't do anything." Testimony of David Swartz ("Swartz's Test."), Tr. at 949–50. Swartz further testified that he understood plaintiff's words to mean that "she couldn't take it any more about [the] men [in peroxide] degrading women." *Id.* at 979–80.

Swartz testified that he spoke with his supervisor, Alan Hubbell, about this incident, and that they decided that Swartz should speak to the men on the shift individually. Swartz's Test., Tr. at 952. With the exception of Walker, however, none of the men on the shift remembered Swartz speaking to them about this incident. Carney testified that Swartz spoke to him "a few times" about not communicating with plaintiff "right after [they] quit talking," but that Swartz soon gave up on trying to talk to him about it "because he knows I'm hardheaded . . . [and there] wasn't no sense [sic] in saying anything else." Carney's Test., Tr. at 883–84.

Swartz testified that he could tell "there was tension on the shift" beginning in the spring of 1994, and that things did not improve during the rest of the year. Swartz's Test., Tr. at 954–55. He testified that many of the men talked to him about the tension on the shift, and that plaintiff complained to him about the lack of communication and isolation on several occasions. *Id.* at 954, 956. When asked by counsel for DuPont what he, as the shift supervisor, tried to do to address the situation between spring of 1994 and December of 1994, Swartz responded:

> Well, I mean we continually talked to each individual. . . . I worked personally talking to each one of them hopefully [sic] that we could get back together, you know, as a more friendly group where it would relieve the tension, but it didn't seem to work.

*Id.* at 955.

During the spring and summer of 1994, plaintiff's situation worsened. The men on the shift still refused to eat with her or speak with her. She testified, and Mark Cobb corroborated, that on several occasions Carney would set off false alarms in her area, causing her to run around the peroxide area in search of a non-existent problem.[6] Pollard's Test., Tr. at 38; Cobb's Test., Tr. at 266–69. Cobb testified that Carney would brag to the other men on "A" shift about making plaintiff run all over plant to "show[ ]

---

**4.** Plaintiff regularly attended meetings of the Women's Network.

**5.** This training meeting was not held to address the problems on the shift, rather it was a training

session on work-related matters that was regularly held on Tuesdays.

**6.** Several witnesses testified that the peroxide area was the size of three city blocks.

that he's in control." Cobb's Test., Tr. at 269. Cobb further testified that on two separate occasions after a false alarm had been pulled while plaintiff was cooking her dinner, one of the men would turn up the stove under her food, burning her dinner and rendering it inedible. *Id.* at 270–71. Cobb also stated that on several occasions, Carney would not call out actual alarms from plaintiff's area.[7] *Id.* at 275. As a result, plaintiff would not respond to the problem, and it would appear to the #3 operator on the next shift that she was not doing her job. *Id.* at 275.

Part of plaintiff's job as the #3 operator was to monitor the vaporizers in the peroxide tanks, determine when they should be moved, and instruct the AOs to move them according to this schedule. Pollard's Test., Tr. at 32–33; Moody's Test., Tr. at 687. Plaintiff testified that, on several occasions, Carney told one of the AOs on "A" shift to remove the vaporizer from the tank earlier than plaintiff had planned for it to be removed, and then instructed them not to tell her that they had done so. Pollard's Test., Tr. at 32–33, 35. Plaintiff needed to sample the peroxide one hour after the vaporizer was removed. *Id.* at 90; Moody's Test. at 710. Accordingly, if the vaporizer was removed early, and plaintiff was not informed that it was removed, the resulting product could be too weak.[8] The fact that the peroxide was not timely sampled also created more work for the #3 operator on the next shift, and made it appear that plaintiff was not doing her job. *Id.* at 94–95. In addition, removing the vaporizer early could mean that not enough peroxide was made for the shipment out to DuPont's customers the next day, again making it appear as if plaintiff was not competently executing her job duties. *Id.* 89–90.

Plaintiff testified that the vaporizers were removed early approximately seven times during 1994 and 1995, with the most recent incident occurring during the week of July 5–11, 1995. After the first time that the problems with the vaporizers occurred, plaintiff spoke with David Walker and Joey Moody about it and asked them not to do it again. *Id.* at 98. Moody told her that he was following Carney's instructions. *Id.* Carney himself testified that he would sometimes tell one of the AOs to move a vaporizer, and that when he did so he did not believe that he had an obligation to tell plaintiff. Carney's Test., Tr. at 895.

Plaintiff testified that she spoke to her supervisor, David Swartz, about the vaporizer problem the second time it occurred, and every time after that. Swartz admitted that he spoke with plaintiff on several occasions during the spring and summer of 1994, and that she complained to him that "she wasn't getting communication—that Steve wasn't calling out alarms or he wouldn't say stuff to her when [vaporizers] were pulled or whatever because she had responsibility [for] sampling those tanks." Swartz's Test., Tr. at 957. Swartz testified that his only response to these complaints was the following:

> I [Swartz] would go to Steve and say "Steve, that's part of your job, you got to call out alarms." His response was, "I'm calling out the alarms, she's not answering it." So I was hearing it from both sides. And I would tell Sharon, "Steve's saying you're not responding to it." And she would say that she was, and so we had to get that communication link straightened out, and I thought that eventually that worked out. . . .

*Id.* 957. The evidence in the record, however, demonstrates that the problem was *not*

---

7. Based on the testimony during the trial, it appears that the control room operator sits in the control room of the peroxide area and monitors a series of instrument panels. If there is a problem, the control room operator will become aware of it via these instruments. The control room operator is then supposed to call out an alarm over the intercom system to the operator or AO working in the relevant area, so that the appropriate individual can go check on the problem.

8. Various percentage strengths of peroxide were made at DuPont. Plaintiff testified that if a tank was off even 2%, e.g., a tank that was supposed to be 70% strength was 68% instead, it could not be brought back up to the proper percentage because the volume of chemicals that would have to be added would not fit into the already full tank. Pollard's Test., Tr. at 102–03.

solved, and that Swartz never investigated plaintiff's complaints further.

During the summer of 1994, plaintiff came to work one day and found that both of the tires on her bicycle had been slit open.[9] Swartz admitted that the day that plaintiff discovered that the tires had been cut, she reported it to him and told him that she suspected that Carney was responsible. Swartz's Test., Tr. at 959. In response to this complaint, Swartz spoke with Carney, and Carney denied cutting plaintiff's tires. *Id.* Again, after Carney denied the allegations, Swartz did nothing else to investigate plaintiff's complaints. Swartz stated, "I didn't have any other facts to go on that would say that he did it." *Id.* 959–60. Accordingly, rather than investigate further, Swartz did nothing.

In December of 1994, after these problems had been occurring for ten months with no improvement, Mark Cobb and David Walker approached David Swartz and asked him to call a meeting with the entire shift to discuss the situation.[10] Accordingly, a meeting was held in late December of 1994 that came to be known as the "first healing meeting." On the date that the meeting was to be held, Carney was on vacation. The members of the shift discussed whether or not they should proceed with the meeting without him, and decided to go ahead.

At this meeting, Walker and Moody told plaintiff that Carney had encouraged them not to talk to her. Pollard's Test., Tr. at 46. Walker and Moody also told plaintiff that Carney had told them that she was "keeping a book on them" in which she wrote down everything they said to use it against them. *Id.* Plaintiff assured them that she was not keeping a book, and then explained to them how stressful the isolation was for her, and how she "had to run around and do more steps than [she] would normally do to get [her] job done . . . because [she] wasn't getting

communicated with." *Id.* at 47. Plaintiff also explained to them that the lack of communication was dangerous because a spill or explosion could result, and that it could also cause a shipment to a customer to be missed. *Id.* at 51. David Swartz was present throughout this meeting and, again, heard all of plaintiff's complaints.

When Carney returned from vacation and learned that "A" shift had held a meeting without him he was furious, and demanded that another meeting be held. Pollard's Test., Tr. at 51; Cobb's Test., Tr. 285–86; Moody's Test., Tr. at 684; Swartz's Test., Tr. at 961. During the second meeting, the entire shift, including Swartz, was present. Plaintiff reiterated all of her concerns about the lack of communication and other problems. Plaintiff also mentioned that her bike tires had been slashed, and another incident that summer in which she believed that Carney had tried to run her off the road in his truck as she left the DuPont plant.[11] Moody's Test., Tr. at 685; Walker's Test., Tr. at 738. At the second meeting, Carney "got in [plaintiff's] face" and said "Nobody in this area likes you, you're here all alone, it's all your own fault." Pollard's Test., Tr. at 52; Moody's Test., Tr. at 684–85; Cobb's Test., Tr. at 289–90. Plaintiff then turned to Swartz, who was observing this interaction, and asked him if he was going to permit Carney to speak to her in that manner. Cobb's Test., Tr. at 290–91; Pollard's Test., Tr. at 52; Swartz's Test., Tr. at 993. Swartz then said "I think that's enough," and the meeting ended with no further resolution of the issues. *Id.*

Subsequent to these meetings, the situation did not improve. Swartz was aware that the hostility and tension on the shift had not abated, and plaintiff continued to complain to him that the environment was intolerable for her. Swartz's Test. at 964. Swartz, however, took no action to help her. During this

---

9. Because the DuPont plant is so large, employees often ride bicycles from the front gate to their area.

10. The Court notes that even after all of the complaints that Swartz had received during the past ten months from plaintiff, the idea to call a meeting to discuss the situation was not his.

11. Swartz concedes that he never did anything to investigate plaintiff's allegation that Carney tried to run her off the road. Swartz's Test., Tr. at 1004.

time period, plaintiff attended several meetings of the Women's Network and spoke to the group about the problems she was facing, the isolation she was experiencing, and the psychological effect it was having on her. Jenks' Test., Tr. at 415–17. Kay Jenks, a female engineer and one of the leaders of the Woman's Network, testified that during the Network meetings plaintiff:

> was concerned that she would be out there on nights, frequently the only woman on shift, she would go for hours without even hearing another voice....She was concerned that something would happen that would endanger her and they would not tell her, they would not get ahold of her, she was also concerned that maybe something would go wrong in the process that she could help fix or impact, but they wouldn't let her know in time and then it would reflect poorly on her performance.

*Id.* at 417.

In attendance at some of these meetings was Beth Basham, unit supervisor for the peroxide area.[12] Basham conceded that she heard plaintiff talk about the problems she was having with the men in peroxide on several occasions. Basham's Test., Tr. at 1184, 1194–95. Basham further testified that she "knew there was a real problem in the peroxide area of the male workers accepting the role of a female in that area," and that she "was of the firm belief that plaintiff had been harassed on account of her sex in the peroxide area." *Id.* at 1195, 1217. In spite of this knowledge, however, Basham never investigated the situation based on what she had learned at the Women's Network meetings.[13] Basham testified that she never wrote a report or sent a memorandum to anyone in upper management at DuPont stating that there was a real problem in the peroxide area regarding the treatment of female employees, and she "could not recall"

if she ever discussed the situation with anyone at DuPont's headquarters informally. *Id.* at 1197–98.

On May 25, 1995, the Women's Network hosted a meeting at which Bernie Scales, a specialist in diversity training from DuPont's headquarters, spoke to the Network. At that meeting, plaintiff began to talk about the isolation and harassment she was receiving from the men in peroxide, and asked to speak to Scales further at the conclusion of the meeting. After the meeting was over, Scales met with plaintiff. At that meeting plaintiff told Scales all about the long-term harassment and isolation she had been experiencing. As a result of that meeting, Scales spoke to the plant manager Gary Lewis, who then spoke to Bob Shaw, employee relations manager for the Memphis DuPont plant.

On May 28, 1995, Shaw, Lee Ann Rice,[14] and Gary Fish[15] met with plaintiff to discuss her situation. During the course of that meeting, plaintiff recounted the full history of the harassment she had experienced in the peroxide area, including the allegation that Carney had tried to run her off the road the previous summer, and told them that she wanted this situation corrected. Testimony of Bob Shaw ("Shaw's Test."), Tr. at 1094; Testimony of Lee Ann Rice ("Rice's Test."), Tr. at 401; Pollard's Test., Tr. at 62. Subsequent to that meeting, Shaw and Swartz spoke to Carney about his behavior. Swartz's Test., Tr. at 968. Carney never received a formal written reprimand, was never suspended from his job, and was never transferred to another shift, demoted, or terminated. Basham's Test., Tr. at 1223; Carney's Test., Tr. at 903–04. In addition, neither Shaw, nor anyone else at Dupont, ever investigated plaintiff's allegation that Carney had tried to run her off the road, after Shaw spoke to Carney and Carney denied that it had occurred. Shaw's Test., Tr. at 1102.

---

**12.** Basham was the supervisor of Alan Hubbell, who was David Swartz's supervisor. Basham was the "number one person in the peroxide area," and reported directly to the plant manager, Gary Lewis. Testimony of Beth Basham ("Basham's Test."), Tr. at 1181–82.

**13.** Basham did become involved in the investigation that took place during the summer of 1995, but, prior to that, did nothing to formally investi-

gate plaintiff's charges of harassment, despite learning of them in the context of the Women's Network meetings.

**14.** Rice is a manager in Human Resources. Her supervisor is Bob Shaw.

**15.** Fish was a plant shift supervisor.

Even after Bernie Scales returned to Wilmington with knowledge of plaintiff's concerns, no one from DuPont headquarters ever came to the Memphis plant to investigate plaintiff's allegations. Basham's Test., Tr. at 1250–51.

After Shaw spoke to Carney, Carney's behavior improved for about four weeks. During the week of July 5–11, 1995, however, Carney returned to his prior patterns of behavior. Pollard's Test., Tr. at 107. Another incident in which the vaporizer was taken out early without plaintiff's knowledge also occurred during this week. *Id.* at 89. Plaintiff went to David Swartz and begged him to "just get me off this shift, nothing's changed and I can't take it." *Id.* at 107. Rather than investigating the situation or moving Carney to another shift, Swartz spoke to plaintiff the next day and informed her that a control room operator position on another shift was available. *Id.* at 108; Swartz's Test., Tr. at 994–96. Plaintiff did not want to take this position because it was on the same shift with Rory Bricco, the man who had refused to take direction from her when she was a control room operator on "C" shift. Plaintiff told Swartz she would not bid for that position. Pollard's Test., Tr. at 108–09.

On July 28, 1995, plaintiff discovered a highlighted copy of the same Bible verse that Bricco had put on her desk when he refused to take direction from her in her mailbox at work. As noted above, that Bible verse read: "A woman should learn in quietness and full submission. I do not permit a woman to teach or have authority over a man, she must be silent." Tr. at 407 (quoting 1 *Timothy* 2:11). When plaintiff discovered the Bible verse, she described her reaction as follows:

> I felt like I had been hit with a brick, I just couldn't believe that after all that had been talked about, they were asking me to go back into the control room...and I just considered [that] this was the men's answer to that.

Pollard's Test., Tr. at 110.

Subsequent to that event, plaintiff never returned to work at DuPont. A committee was formed to investigate the Bible verse incident. As with the other "investigations" that DuPont had initiated with regard to plaintiff's complaints, this one was wretchedly inadequate. The investigation consisted of asking an identical series of typed questions to each of the men on "A" shift individually, and to the other men in the peroxide area in groups. Shaw's Test., Tr. at 1106. All of the questions were answerable with a simple yes or no, and when all of the men denied having any knowledge of the incident, DuPont proceeded no further with the investigation. Shaw's Test., Tr. at 1268, 1270. No one from DuPont management ever questioned Steve Carney about whether he was involved in the Bible verse incident. Carney's Test., Tr. at 931.

After plaintiff left "A" shift, a party was held to celebrate her departure. Cobb's Test., Tr. at 277–79; Carney's Test., Tr. at 931–32. Steve Carney fried catfish and crappie that he had brought in, and the other men blew up balloons and taped them to the ceiling. *Id.* Mark Cobb testified that at the party Carney declared, "glad the bitch is gone, glad the bitch is not coming back." Cobb's Test., Tr. at 278. Carney himself testified as follows:

> Q: Now, after she [plaintiff] left, there was a party in the peroxide are, wasn't there?
>
> A: Yes, ma'am.
>
> Q: And you participated in that party, correct?
>
> A: Yes, ma'am.
>
> Q: And there were balloons at that party, correct?
>
> A: Yes, ma'am.
>
> Q: And I believe there was crappie cooked, correct?
>
> A: Yes, ma'am.
>
> Q: And you do recall that, don't you?
>
> A: Yes, ma'am.
>
> Q: You were celebrating the departure of Sharon Pollard, weren't you?
>
> A: Yes, ma'am.

Carney's Test., Tr. at 931–32.

Plaintiff was on short-term disability leave for the next six months, during which time she saw a number of psychologists and psychiatrists that DuPont required her to visit. In particular, DuPont sent plaintiff to Dr.

Fred Steinberg, who concluded she could not return to work. In spite of this opinion, however, DuPont scheduled a "return to work" meeting with plaintiff in February of 1996. At that meeting DuPont management would not guarantee that plaintiff would not be put back on a shift with Carney. Pollard's Test., Tr. at 219. Plaintiff told them that she could not return to work under those conditions, and DuPont terminated her, effective February 29, 1996. *Id.* at 154, 217–19.

## CONCLUSIONS OF LAW

■ Title VII prohibits discrimination "against any individual with respect to [her] compensation, conditions, or privileges of employment, because of such individual's...sex." 42 U.S.C. § 2000e–2(a)(1). In *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court held that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a hostile or abusive work environment. As noted by the Sixth Circuit in *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 825 (6th Cir.1997), the statute grants employees "the right to be work in an environment free from discriminatory intimidation, ridicule, and insult." 104 F.3d at 825 (quoting *Meritor,* 477 U.S. at 65, 106 S.Ct. 2399).

■ In order to succeed on a hostile work environment claim, a plaintiff must prove the following elements: 1) the plaintiff is a member of a protected class; 2) the plaintiff was subject to unwelcomed sexual harassment; 3) the harassment complained of was based on sex; 4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive work environment; and 5) the employer knew, or should have known, of the charged sexual harassment, and failed to take prompt and appropriate corrective action. *Fleenor v. Hewitt Soap Co.,* 81 F.3d 48, 49 (6th Cir. 1996).

16. Moreover, plaintiff's repeated complaints during the Women's Network meetings, and to the other members of "A" shift during the two "heal-

■ There is no question that plaintiff satisfies the first two elements as required by *Fleenor.* First, as a woman, plaintiff is a member of a protected class. Second, it is clear from plaintiff's repeated complaints, initially to her supervisor David Swartz and later to other members of DuPont management, including Shaw, Rice, Scales, and Basham, that the harassment plaintiff was experiencing was unwelcome.[16]

■ With regard to the third element of the *Fleenor* test, the Court concludes that plaintiff has unequivocally established that the harassment she experienced was based on her gender. As recently clarified by the Supreme Court in *Oncale v. Sundowner Offshore Servs., Inc.,* —— U.S. ——, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), harassment based on gender need not be sexual in nature:

[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination based on sex. A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms...*as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace.*

*Oncale,* —— U.S. at ——, 118 S.Ct. at 1002 (emphasis added).

As noted above, the record is replete with evidence that several of the men in the peroxide area were "motivated by general hostility to women in the workplace," and felt strongly that women did not belong in the peroxide area. Cobb's Test., Tr. at 246–47, 251, 359, 361; Walker's Test., Tr. at 746–47; Basham's Test., Tr. at 1195. Specifically as to plaintiff's shift, Steve Carney stated that women didn't belong there approximately five times per week, and routinely referred to women as "bitches" and "cunts." Cobb's Test., Tr. at 264, 266; Lee's Test., Tr. at 491–92; Walker's Test., Tr. at 751–52. Use of the term "heifer" to refer to women was commonplace behavior by men in the peroxide area. Moody's Test., Tr. at 697; Lee's

ing" meetings held in December 1994, further support the Court's conclusion that the harassment was unwelcome.

Test., Tr. at 489–90; Walker's Test., Tr. at 723.

Carney himself testified that he referred to women as "heifers" and that he referred to plaintiff as a "bitch" and a "split tail." [17] Carney's Test., Tr. 908–09. Carney, and the other men on "A" shift, repeatedly voiced their objections to the Women's Network and to DuPont's participation in "Take Your Daughters to Work Day." Even Beth Basham, DuPont's unit supervisor of the peroxide area, conceded that she "was of the firm belief that plaintiff had been harassed on account of her sex in the peroxide area." Basham's Test., Tr. at 1217. Finally, the content of the Bible verse placed in plaintiff's mailbox on July 28, 1995, leaves absolutely no doubt in the Court's mind that the harassment of plaintiff was based on her gender.

■ As to the question of whether the harassment was pervasive enough to constitute a hostile work environment and unreasonably interfere with plaintiff's work performance, the Supreme Court reaffirmed the standard set forth in *Meritor,* and further clarified it in *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In *Harris,* the Court explained that the conduct must be judged by both an objective and subjective standard. 510 U.S. at 21–22, 114 S.Ct. 367. Accordingly, "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black,* 104 F.3d at 826 (citing *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367.) "This standard...takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Harris,* 510 U.S. at 21, 114 S.Ct. 367.

The Supreme Court acknowledged that this approach is not susceptible to a "mathematically precise test," *id.* 510 U.S. at 22, 114 S.Ct. 367, but sought to provide some guidance with regard to the determination of whether a work environment was objectively hostile or abusive. The Court explained that all of the circumstances should be consid-

ered, and offered a non-exhaustive list of relevant factors, including:

> [T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.* 510 U.S. at 23, 114 S.Ct. 367.

Based on the evidence set forth above, the Court concludes that harassment faced by plaintiff while she was on the "A" shift at DuPont, and specifically during the December 1994 through December of 1995 period relevant to liability in this case, constituted a pervasively hostile environment and unreasonably interfered with her work performance. The false alarms, failure to communicate alarms and other information necessary for plaintiff's job, and the early removal of the vaporizers at Carney's instruction on several occasions, are examples of direct interference with plaintiff's execution of her job duties. This kind of deliberate tampering with plaintiff's area of responsibility could have, and very well may have, resulted in safety risks or production shortages, and made plaintiff appear incompetent to the #3 operator on the next shift.

■ Moreover, as Justice Ginsburg noted in her concurring opinion in *Harris,* to show unreasonable interference with a plaintiff's work performance, " 'the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment.' It suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to 'ma[k]e it more difficult to do the job.' " 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (Ginsburg, J., concurring)(quoting *Davis*

---

**17.** The Court notes that several witnesses testified that they considered Carney to be a "lead-

er." Walker's Test., Tr. at 757; Swartz's Test., Tr. at 992.

*v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir.1988)). The Court finds that plaintiff has demonstrated that the harassment so altered her working conditions as to make it more difficult to do her job, on both an objective and subjective level.

Plaintiff testified that she suffered from nightmares, fear of crowds, nausea, anxiety, and sleeplessness. A psychologist and a psychiatrist who saw plaintiff both concluded that she suffered from post-traumatic stress disorder. *See* Testimony of Dr. Janet Hill, Tr. 775–851; Testimony of Dr. Richard Farmer, Tr. 502–79. Several witnesses testified about the dramatic change in plaintiff's personality during this time period. Jenks' Test., Tr. at 418; Testimony of Charlotte Blaylock, Tr. at 442–44; Testimony of John Pollard, Tr. at 451–52.

Plaintiff testified extensively about the enormous psychological effect the long-term campaign of harassment, intimidation, and isolation executed by the men on "A" shift had on her mental and emotional state. Plaintiff stated that the last straw in the long ordeal, the placing of the Bible verse in her mailbox at work, so upset her and interfered with her ability to perform her job that she left her position at the plant where she had worked for the past seventeen years and did not return. Accordingly, the Court concludes that plaintiff has satisfied the fourth requirement necessary for a hostile environment claim, in that she has demonstrated that the harassment "unreasonably interfer[ed] with [her] work performance and creat[ed] an intimidating, hostile, [and] offensive working environment." *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir.1996).

Finally, the Court must consider whether DuPont knew, or should have known, of the charged sexual harassment and failed to take prompt and appropriate corrective action. The evidence on this point is overwhelming. As set forth above, beginning in the spring of 1994, plaintiff complained about the lack of communication, constant disparaging remarks about women, and the sabotage of her work by the men on her shift to her supervisor, David Swartz.

Time and time again, after receiving these complaints from plaintiff,[18] Swartz either made a half-hearted attempt to speak to Carney, which ended as soon as Carney denied the conduct, or did nothing at all. Carney testified that after a few attempts, Swartz quit talking to him because he was "hard-headed" and Swartz knew "there wasn't no sense [sic] in saying anything else." Carney's Test., Tr. at 883–84. Swartz himself conceded that his efforts to remedy the situation "didn't seem to work." Swartz's Test., Tr. at 955. However, Swartz took no further steps to end the campaign of harassment being waged against plaintiff by the men on "A" shift.

Swartz testified that, at least after the softball coach incident in May of 1994, he spoke to his supervisor Alan Hubbell about the situation in peroxide. Swartz's Test., Tr. at 952. In spite of the fact that the situation did not improve, Hubbell never followed-up on the situation or initiated any kind of formal investigation. Beth Basham, the highest-ranked supervisor in the peroxide area, testified that she was on notice of the harassment plaintiff was experiencing based on her attendance at Women's Network meeting at which plaintiff spoke about her situation. Basham, Tr. at 1184, 1194–95. Just as with Swartz, however, Basham did nothing to investigate the situation or discipline the individuals involved. After Bob Shaw, employee relations manager for the Memphis plant, became aware that this harassment had been ongoing since 1994, Shaw spoke to Carney about it, but never formally disciplined him in any way. Bernie Scales, from DuPont headquarters, was aware of the situation based on plaintiff's meeting with him on May

---

18. The Court notes that the testimony of both plaintiff and Swartz reveals that plaintiff discussed her situation with Swartz throughout the latter half of 1994 and in 1995. As to specific instances, however, the record reveals that Swartz was on notice of plaintiff's complaints in May of 1994 after Carney's comment that "women had no business coaching" at the training meeting, during the summer of 1994 when plaintiff complained to Swartz the day after her bicycle tires were cut, and in December 1994 when Swartz was present at the two "healing meetings" at which plaintiff set forth all of her complaints and concerns. Swartz's Test., Tr. at 949–50, 979–80, 958, 959–60, 993.

25, 1995. However, no one from DuPont's headquarters ever visited the Memphis plant to follow-up on plaintiff's situation or conduct an investigation of her allegations.

Several witnesses testified that DuPont has a progressive disciplinary system in which employees are to receive increasingly severe sanctions if the misconduct at issue does not cease. Sanctions in this system range from an informal oral reprimand to termination. In spite of all of the complaints plaintiff made against him, and the fact that the situation did not improve, Steve Carney never received a formal written reprimand, was never suspended from his job, and was never transferred to another shift, demoted, or terminated. Basham's Test., Tr. at 1223; Carney's Test., Tr. at 903–04.

This situation was reprehensible. This is a case of wretched indifference to an employee who was slowly drowning in an environment that was completely unacceptable, while her employer sat by and watched. Plaintiff repeatedly complained to DuPont management to no avail. Accordingly, the Court concludes, without reservation, that DuPont knew of the charged sexual harassment and utterly failed to take prompt and appropriate corrective action.

Plaintiff has, therefore, satisfied each of the elements necessary to prove that she was subjected to a hostile work environment based on her gender in violation of Title VII, and judgment is ENTERED in favor of plaintiff as follows:

1. Defendant is ORDERED to pay plaintiff $107,364.00 in back pay and accrued benefits;

2. Defendant is ORDERED to pay plaintiff $300,000.00 in compensatory damages,[19] in accordance with the statutory cap set forth in 42 U.S.C. § 1981a(b)(3); and

3. Defendant is ORDERED to pay plaintiff's attorney fees and costs. Plaintiff shall submit a statement of fees and costs related to this matter to the Court by September 15, 1998. Defendant may file a response to plaintiff's submittal by September 30, 1998. The Court will then determine the appropriate amount of attorneys fees and costs to be awarded, and will so advise the parties.

---

**19.** The amount of compensatory damages includes front pay, pursuant to the Sixth Circuit's holding in *Hudson v. Reno*, 130 F.3d 1193, 1204 (6th Cir.1997) ("[W]e conclude that front pay is subject to the caps on future pecuniary losses as provided in § 1981a(b)(3) because front pay is a 'future pecuniary loss.'") The Court notes that the $300,000.00 award is, in fact, insufficient to compensate plaintiff for the psychological damage, pain, and humiliation she has suffered, in addition to the loss of a lucrative career and secure retirement. The Court is bound by the statutory cap set forth in § 1981a however, and cannot award plaintiff compensatory damages in excess of that cap.

Because the amount of compensatory damages awarded by the Court is $300,000.00, the Court

is thus prohibited by the statutory cap from awarding plaintiff any punitive damages. *See* 42 U.S.C. § 1981a(b)(3) ("The sum of the amount of compensatory damages awarded...and the amount of punitive damages awarded ...shall not exceed...$300,000.00"). For the record, however, the Court finds that punitive damages are justified in this case, as defendant has "engaged in a discriminatory practice with malice or with reckless indifference to the federally protected rights of an aggrieved individual," 42 U.S.C. § 1981a(b)(1), and, absent the statutory cap, the Court would have awarded punitive damages based upon DuPont's repeated failure to remedy this egregious situation.