Gregory ARMSTRONG, Plaintiff,

v.

MEIJER, INC. dba/Meijer Distribution Center, and Diane Roepcke, Defendants.

No. C–3–97–410.

United States District Court,
S.D. Ohio,
Western Division.

Dec. 17, 1998.

Alfred John Weisbrod, Weisbrod & Lopez Co., LPA, Dayton, OH, Scott W Earhart, Weisbrod & Lopez Co, Dayton, OH, for plaintiff.

Robert Thomas Dunlevey, Marc Lawrence Fleischauer, Dunlevey, Mahan & Furry, Dayton, OH, for defendants.

## ORDER

DLOTT, District Judge.

This matter comes before the Court to consider the Defendant Meijer Inc.'s Motion for Summary Judgment (Doc. # 19) and Plaintiff's Motion to Strike the Affidavit of Ken Barton (Doc. # 23). For the following reasons, the Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion to Strike is **DENIED**.

## I. MOTION TO STRIKE

▪ ■ Plaintiff moves this Court to strike the affidavit of Ken Barton attached as Exhibit C to Defendant's Motion for Summary Judgment. Plaintiff argues that Barton's affidavit should be stricken because it is based on hearsay. Barton is a Senior Office Management and Professional Team ("OMP") Relations Specialist at Meijer, Inc. in the company's Fairborn, Ohio office. He is responsible for "maintaining and creating positive relationships for all of our office management and professional team members." (Barton Depo. 8.) In this role, he is involved in the process of disciplining Meijer employees. (Barton Depo. 8–9.) Barton investigated the allegations in this case and kept the records of his investigation. (Defendant's Response to Plaintiff's Motion to Strike Aff. at 2–3.)

Barton states in his affidavit that his statements are based upon his "personal knowledge of the events referenced and of the books and records of the Company, which are maintained by the Company in the ordinary course of its business." (Barton Aff. ¶ 1.) The majority of the affidavit recounts statements and observations made by Barton. In addition, Barton is responsible for keeping records of sexual harassment investigations. (Defendant's Response to Motion to Strike at 2–3). To the extent that Barton recounts events and facts recorded in the ordinary course of Meijer's business, therefore, his statements are within the hearsay exception of Federal Rule of Evidence 803(6).

Accordingly, Plaintiff's Motion to Strike the Affidavit of Ken Barton is **DENIED**.

## II. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. BACKGROUND

Plaintiff, a 39–year–old male, seeks damages under Title VII, 42 U.S.C. §§ 2000e, et seq. and Ohio Civil Rights Act, Ohio Revised Code Chapter 4112, against his former employer and a coworker, Defendants Meijer et al., for sexual harassment and retaliation. Plaintiff alleges that a coworker, Defendant Diana Roepcke, subjected him to sexual harassment while he was a Loss Prevention Officer (security officer) for Defendant Meijer, Inc.

Plaintiff began work as a Loss Prevention Officer ("LPO") at the Meijer distribution facility in Tipp City, Ohio on December 23, 1996 after completing an interview process with Meijer supervisor Jack Evans. (Evans Depo. 7.) As a new employee, Plaintiff began his employment pursuant to a 90 day probationary period. (Armstrong Depo. 49.) Shortly after he started work at Meijer, Plaintiff was assigned to work on the third shift with three other LPOs—Diana Roepcke, Tina Crego and Michael Austin. (Armstrong Depo. 28, 36–37.) Tina Crego was the Officer in Charge ("OIC") on the third shift. (Crego Depo. 9–10.) This was not a supervisory position in that Crego had no authority to assign work, discipline employees, or exercise independent supervisory judgment. (Id.) As an OIC, Crego was responsible for checking off a list of completed shift assignments, (Armstrong Depo. 31–32) and was a primary contact to answer loss prevention questions in the absence of management (Barton Depo. 41–42). Defendant Roepcke substituted as OIC when Crego was not on the shift. (Armstrong Depo. 40.)

Shortly after being assigned to the third shift, Plaintiff requested a transfer to the day shift. Meijer informed Plaintiff that he was ineligible for a transfer because of his lack of seniority. (Armstrong Depo. 231.) Nonetheless, on January 8, 1997,

Plaintiff sent Evans an electronic mail message informing him, "Everything is going very well. The folks on third shift are very helpful...." (Armstrong Depo. 56–8, Ex. 7.)

### 1) Plaintiff's Complaints

Beginning on or about January 25, 1997, Plaintiff made several oral and/or written complaints to his supervisor regarding Diana Roepcke, several of which did not involve allegations of sexual harassment.[1] In a report dated January 25, 1997, Plaintiff informed Evans that Roepcke was "loud," and pushy towards him and CPO Austin. (Armstrong Depo. 72, Ex. 9.) In his deposition, Plaintiff testified that this incident did not involve sexual behavior. (Armstrong Depo. 72.) In a report dated February 11, 1997, Plaintiff alleged that he had witnessed an argument between Roepcke and Austin about who would log the arrival of delivery trucks into the complex. (Armstrong Depo. 73–74.) Plaintiff claimed in his report that "on four occasions [Roepcke] kept running her breasts against Mike [Austin], while he was sitting in the chair." (Armstrong Depo. 73–74, Ex. 10.) Austin also filed a written complaint about this incident stating that Roepcke "rested her breast against [his] left arm." (Armstrong Depo. 123, Ex. 17.) Crego, also present for the verbal altercation, testified that nothing sexually provocative occurred. (Crego Depo. 20–21.)

In a report dated February 15, 1997, Armstrong alleged that Roepcke had improperly "harassed" another employee for improperly attaching and using a snowplow. (Armstrong Depo. 76–77, Ex. 11).

Plaintiff acknowledges that this alleged incident did not involve any sexual behavior. (Armstrong Depo. 76–77.) Plaintiff completed and submitted two more reports dated February 17, 1997. In one of these reports, Plaintiff alleged that Roepcke had failed to respond quickly enough when Plaintiff had injured himself earlier in the month. (Armstrong Depo. 89, Ex. 12.) In the second report, Plaintiff made three allegations against Roepcke: (1) that she had failed to perform a safety test; (2) that she had taken something out of supervisor Evan's mailbox; and (3) that she had referred to Evans as an "asshole" and a "prick." (Armstrong Depo. 86–87, Ex. 13.) Plaintiff does not allege that either of his February 17th reports involve complaints of sexual harassment. (Armstrong Depo. 80, 88.)

Plaintiff states that he made two additional complaints, at least orally, regarding Roepcke's sexual behavior at work. (Armstrong Depo. 75, 83, 149.)[2] According to Plaintiff, he complained that on one occasion in which he, Austin and Crego were present (Armstrong Depo. 151.), Roepcke made references to oral sex while eating a creme-filled chocolate Easter egg. (Armstrong Depo. 152–53.) The second incident allegedly occurred on or about Valentine's Day, February 14, 1997. Plaintiff states that he informed Evans that Roepcke told him that she had sex with a particular truck driver once a year and briefly described her favorite sexual position. (Armstrong Depo. 160.)[3]

---

1. The record is unclear regarding the exact dates on which Plaintiff informed Defendant Meijer of his complaints about Roepcke. Plaintiff testified in his deposition that he complained orally to Crego and Evans but could not recall the exact dates. (Armstrong Depo. 81–84.) Crego and Evans also could not remember the specific dates of Plaintiff's oral complaints. (Crego Depo. 19–21; Evans Depo. 16.) Plaintiff further testified that Crego and Evans instructed him to submit his complaints in writing and therefore, he backdated several of his written reports. (Armstrong Depo. 81–86, 89). Plaintiff filed the reports sometime between February 11 and February 17, 1997, the first and last dates shown on the reports.

2. Plaintiff stated in his deposition that he filed written reports regarding these incidents. These documents, if they exist, were not exchanged in discovery.

3. Austin filed a written report dated February 12, 1997 in which he details an incident in which Roepcke made similar statements to him. (Armstrong Depo., Ex. 18). This report does not mention Plaintiff.

### 2) Defendant Meijer's Response

Plaintiff initially brought his complaints about Roepcke to Crego, who relayed the information to Evans. (Armstrong Depo. 84; Crego Depo. 19–20, 28–30.) Crego made a handwritten list of both Plaintiff's and Austin's complaints about Roepcke and gave it to Evans. (Crego Depo. 28–30, Ex. 2.) This list included the "breast rubbing" incident and the allegation that Roepcke was talking about her sex life. (Crego Depo., Ex 2.) The list did not include the "Easter egg" incident. Plaintiff testified that he had a meeting with both Crego and Evans in which they instructed him to put his complaints in writing. (Armstrong Depo. 84, 92–96.)

On February 19, 1997, after Plaintiff submitted his written complaints, Evans informed Ken Barton, Senior OMP Relations Specialist for Meijer, Inc. of the various allegations. (Barton Aff. ¶ 7.) The same day, Barton wrote a memo to Evans instructing him to conduct a fact-finding meeting with Roepcke. (Barton Aff. ¶, Ex. C.) Barton specifically noted that Evans should "make sure the officers who brought these concerns forward understand that they should come to you immediately with any concerns." (Id.) Barton listed specific issues for Evans to address. This list included the "breast rubbing" incident but not the allegations regarding the "Easter egg" or Roepcke talking about her sex life. (Id.)

Evans conducted the fact finding meeting with Roepcke the same day, February 19, 1997. (Barton Aff. ¶ 8; Roepcke Depo. 34–36, Ex. 1.) During the meeting, Roepcke admitted that she had not performed the fire pump safety test. She also admitted to sorting Evan's mail, but denied that this violated any company policy. She denied using foul language about Evans, although she indicated that Armstrong and Austin had themselves called Evans an "asshole" and a "prick." Finally, she did not recall touching Austin with her body and noted that the office the four employees worked in was "so small" that if she touched someone it was inadvertent.

(Roepcke Depo. 40–41, 50; Barton Aff., Ex. D.)

The company disciplined Roepcke on February 26, 1997, providing her with a formal written reprimand. (Roepcke Depo., Ex. 1.) The written reprimand noted that she had improperly failed to perform the fire pump test and cautioned her that making any physical contact with other employees is "unprofessional and detrimental to Company interests." (Id.) Further, the writing warning stated, "It is not acceptable to conduct yourself in a manner which causes another team member to feel uncomfortable." (Id.) The company also provided Roepcke with copies of Meijer's policies on "language sensitivity" and "sexual harassment," (Roepcke Depo. 52.) and removed her from her duties as relief OIC. (Roepcke Depo. 33.)

The Defendant alleges that Evans met with Plaintiff on February 27, 1997 to inform him that the company was taking appropriate action to resolve his conflict with Roepcke. (Barton Aff. ¶ 10.) Plaintiff, however, maintains that Evans told him only that an investigation of Roepcke had been conducted but that Evans could not inform him of the results because that information was confidential. (Armstrong Depo. 96–100.) Plaintiff also states that Evans gave him the company's policy on language sensitivity at this meeting. Plaintiff states that he asked Evans to put him on a different shift than Roepcke but that Evans refused and told Plaintiff that he would have to "put up" with Roepcke's actions. (Armstrong Depo. 96–100, 222–25.) A "Store Meeting Report" indicates that Evans met with Plaintiff and discussed "language sensitivity" and "sexual harassment." (Armstrong Depo., Ex. 14.)

Plaintiff admits that no inappropriate or "sexual" conduct by Roepcke occurred from February 14 to February 26, 1997. (Armstrong Depo. 233.) Nonetheless on February 28, 1997, Plaintiff did not come in for his scheduled shift. Instead, Plaintiff called the plant manager, Tom Nakfoor, and informed Mr. Nakfoor that he

would not be coming into work because his shift had not been changed. (Armstrong Depo. 185.) Nakfoor, who was not aware of the investigation and discipline of Roepcke, told Plaintiff that he would look into the matter and that Plaintiff's concerns would be "taken care of." (Id.)

On March 1, 1997 Plaintiff prepared a four-page memo which he faxed to Evans, the media, and various agencies. (Armstrong Depo. 171, Ex. 20.) In this memo, Plaintiff stated that he would not return to his shift until the company discharged Roepcke. ˙(Id.) Plaintiff did not come into work from March 1 to March 4, 1997. (Armstrong Depo. 226–36.) On March 4, 1997, Rick Hershberger, a manager at Meijer, and Evans met with Plaintiff to clarify the accusations he had made in his March 1 memo and to discuss any outstanding complaints he still had. (Armstrong Depo. 237–45.) Hershberger attended the meeting in place of Nakfoor who was out of town. (Id.) Plaintiff reiterated that he would remain off work until the company changed his shift. (Armstrong Depo. 244.)

Based on the March 4, 1997 meeting, Ken Barton decided on March 5, 1997 to recommend discharge for Plaintiff. Barton made an entry in Plaintiff's file recommending "probationary termination" because of Plaintiff's poor attendance rate and insubordination during his 90–day introductory period. (Barton Aff. ¶ 16, Ex. F.) This recommendation was in accordance with Meijer's attendance policy for Loss Prevention Officers, which states, "We depend everyone to be present for work as scheduled in order to get our jobs done. Excessive or repeated absenteeism or tardiness, whether excused or unexcused, will not be accepted." (Barton Aff. ¶ 16, Ex. G.)

Plaintiff was scheduled to work on March 7 and 8, 1997, but did not report to work on either day. On March 10, 1997 Nakfoor and Evans met with Plaintiff and informed him that he was being discharged for failing to report to work for the prior week and a half. (Armstrong Depo. 248–49; Barton Aff. ¶ 17.) Plaintiff filed this suit on September 16, 1997.

## B. SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Fed.R.Civ.P. 56. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which nonmoving party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On those issues for which it shoulders the burden of proof, the moving party must make a showing that is " 'sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.' " *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–88 (1984)) (emphasis omitted). For those issues where the moving party will *not* have the burden of proof at trial, the movant must "point[ ]out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly sup-

ported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.Pro. 56(e). If the defendant moves for summary judgment based on the lack of proof of a material fact, "[t]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient" to overcome the summary judgment motion. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. Thus, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

## C. ANALYSIS

### 1) Sexual Harassment

■ Armstrong alleges violations of the harassment and retaliation provisions under both 42 U.S.C. § 2000e and Ohio Revised Code Chapter 4112. The Ohio Supreme Court has held that federal case law applying Title VII is generally applicable to cases involving Chapter 4112. *See Plumbers & Steamfitters Joint Apprenticeship Comm. v. O.C.R.C.,* 66 Ohio St.2d 192, 421 N.E.2d 128 (1981). Therefore, this Court will analyze all of Plaintiff's claims under federal case law standards.

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1). In *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court held that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex created a hostile or abusive work environment. The statute grants employees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Id.* at 65, 106 S.Ct. 2399.

In order to prevail on his hostile work environment claim, Plaintiff must show:

(1) that he was a member of a protected class; (2) that he was subject to conduct of a sexual nature; (3) that the harassment complained of was based on sex; (4) that the actions had the effect of unreasonably interfering with his work performance and created an intimidating, hostile environment that seriously affected his psychological well-being; and (5) that his employer knew or should have know of the harassment and failed to take prompt and appropriate remedial action. *See Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 183 (6th Cir.1992) (citations omitted).

In order to satisfy the fourth prima facie requirement, the conduct complained of must be severe or pervasive. *See Meritor,* 477 U.S. at 67, 106 S.Ct. 2399; *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 825 (6th Cir.1997). In *Meritor,* the Supreme Court emphasized "that not all workplace conduct that has sexual overtones can be characterized as harassment forbidden by the statute." *Zaring Homes,* 104 F.3d at 826. In *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court explained that the conduct in question must be judged by both an objective and subjective standard, i.e., (a) the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive; and (b) Plaintiff must subjectively regard the environment as abusive. The relevant factors this Court must consider are:

[T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.* at 23, 114 S.Ct. 367. Whether Roepcke's conduct created a hostile environment is a legal question that may be addressed on summary judgment. *See Klemencic v. Ohio State Univ.,* 10 F.Supp.2d 911, 916 (S.D.Ohio 1998); *see also Black v. Zaring Homes, Inc.,* 104 F.3d 822 (6th Cir.1997).

In the present case, viewing the totality of the circumstances in a light most favorable to the Plaintiff, Defendant Roepcke's alleged conduct does not rise to a level sufficient to create a hostile work environment. Plaintiff's failure to report to work may support his argument that he found the environment subjectively abusive. Considered under an objective standard, however, the conduct was not sufficiently severe or pervasive to support a hostile environment claim. According to Plaintiff's deposition testimony, only two alleged incidents form the basis for his harassment claim: Roepcke's comment that she had sex once a year with a truck driver, and Roepcke's reference to oral sex while eating a candy egg. (Armstrong Depo. 168–69.) Even if the Court considered the alleged incident in which Roepcke came into physical contact with Plaintiff's co-worker Austin, such isolated incidents with sexual overtones are not serious enough to rise to the level of discriminatory changes in the "terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, ——, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). As the Supreme Court has repeatedly emphasized Title VII is not a "general civility code" and simple teasing, offhand comments, sporadic use of abusive language or gender-related jokes do not amount to actionable sexual harassment. *See id.* The conduct alleged by Plaintiff does not give rise to a claim of sexual harassment.

Plaintiff's affidavit filed as an exhibit to his Memorandum in Opposition to Defendant's Summary Judgment Motion does not convince this Court otherwise. In his affidavit, Plaintiff states:

Diana Roepcke ... made, on numerous occasions, sexually oriented remarks and jokes, comments about her sex life and what she enjoyed, comments about other Meijer, Inc. employees sex life and activities and other sexually explicit conduct, including rubbing her breasts up against another male employee in my presence and talking about oral sex while eating a creme filled candy egg with the insides running down her chin.

Such generalized statements about "numerous" sexually oriented remarks, comments and jokes are not sufficient to defeat Defendant's motion for summary judgment. First, the Plaintiff fails to "set forth *specific* facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). In addition, Plaintiff's affidavit directly contradicts his deposition testimony where Plaintiff conceded that his claim for hostile environment sexual harassment is bases on two isolated incidents. (Armstrong Depo. 124, 167–69.) "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir.1986).

### 2) Retaliation

■ In addressing Title VII retaliation claims, the Sixth Circuit has articulated a plaintiff's prima facie burden as follows:

[T]he plaintiff must show: first, protected participation or opposition under Title VII known by the alleged retaliator; second, an employment action or actions disadvantaging persons engaged in protected activities; and third, a causal connection between the first two elements, that is, a retaliatory motive playing a part in the adverse employment actions.

*Zanders v. National Railroad Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir.1990) (citations omitted). If a plaintiff establishes his prima facie case, defendant must articulate a legitimate, nondiscriminatory reason for its action. *See Zanders,* 898 F.2d at 1134. If the defendant makes this showing, the burden shifts back to the plaintiff to prove that the employer's prof-

fered explanation is pretextual. *See Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir.1994). In *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 347, (6th Cir.1997), the Sixth Circuit held that a fact finder may infer discrimination, without additional proof, once a plaintiff has disproved the reasons offered by a defendant. In other words, when a plaintiff provides sufficient evidence that the defendant's proffered reasons have no basis in fact or are insufficient to motivate discharge, a jury may permissibly infer discriminatory intent.

 Plaintiff contends that he was constructively discharged in retaliation for reporting Roepcke's sexual harassment and the Defendant Meijer's failure to remedy the harassment. The test for determining whether an employee was constructively discharged is whether working conditions are so intolerable that a reasonable person would have felt compelled to resign. *See Pitts v. Michael Miller Car Rental*, 942 F.2d 1067 (6th Cir.1991); *Mauzy v. Kelly Services, Inc.* 75 Ohio St.3d 578, 664 N.E.2d 1272 (1996). No reasonable jury could find that the evidence in the present case supports a constructive discharge claim. Plaintiff first refused to work on February 28, 1997. Yet, according to his deposition testimony, no alleged sexual harassment had occurred since February 14, 1997. (Armstrong Depo. 233.) Plaintiff testified that he did not want to return to his shift because he was concerned that Roepcke would manufacture lies and accusations about him. (Armstrong Depo. 221–22.) Plaintiff's only basis for this fear was "shoptalk" and Roepcke's comment when he first started working that "if [he] went up against her, ... [he] wouldn't have a job." (Armstrong Depo. 210.) A reasonable person in this situation would not have felt compelled to resign because Roepcke had no authority to fire or even discipline Plaintiff.

Defendant Meijer has offered a legitimate, non-retaliatory reason for Plaintiff's discharge, his absenteeism and insubordination. Plaintiff refused to work because he wanted his shift changed or Roepcke

fired. Defendant Meijer, however, was not required by Title VII to fire Roepcke or change Plaintiff's shift. Plaintiff was not entitled to dictate his employer's response to his allegations. Defendants responded to Plaintiffs' complaints by investigating Roepcke and giving her a written reprimand. "When an employer implements a remedy, it can be liable for sex discrimination in violation of Title VII only if that remedy exhibits such indifference as to indicate an attitude of permissiveness...." *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 873 (6th Cir.1997). Defendants' response in the present case did not constitute such permissiveness. Finally, Plaintiff has offered no proof that Defendant's reasons for firing him were pretextual.

Accordingly, Defendant Meijer Inc.'s Motion for Summary Judgment is **GRANTED.**

**IT IS SO ORDERED.**