**Sharon B. POLLARD, Plaintiff,**

v.

**E.I. DUPONT DE NEMOURS, INC., Defendant.**

**No. 95–3010 MI.**

United States District Court,
W.D. Tennessee,
Western Division.

Aug. 27, 2003.

Alayne B. Adams, Law Office of Alayne B. Adams, Ft. Myers, FL, Kathleen L. Caldwell, Law Office of Kathleen L. Caldwell, Samuel J. Muldavin, Memphis, TN, for Plaintiff.

J. Michael Brown, Wyatt Tarrant & Combs, LLP, Louisville, KY, Stephen D. Goodwin, Eugene J. Podesta, Jr., Maurice Wexler, Baker Donelson Bearman Caldwell & Berkowitz N. Victoria Holladay, Carl I. Jacobson, Ford & Harrison, LLP, Larry Killebrew, Butler Snow O'Mara Stevens & Cannada, PLLC, J. S. Wilson, III, Wyatt Tarrant & Combs, Memphis, TN, for Defendant.

### OPINION AND ORDER AWARDING COMPENSATORY DAMAGES AND FRONT PAY

MCCALLA, District Judge.

This case is currently before the Court to determine the amount of compensatory damages and front pay that Plaintiff should be awarded. The Court held a damages hearing on July 21, 23, 24, 28, and 29, 2003. Plaintiff Sharon Pollard was represented by Kathleen Caldwell, Esq. Defendant E.I. DuPont de Nemours, Inc. ("DuPont") was represented by Stephen Goodwin, Esq., Eugene Podesta, Esq., and Maurice Wexler, Esq.

The Court previously determined the question of liability under Title VII in favor of Plaintiff on August 20, 1998 after a bench trial held in October, 1997. The Court awarded $107,364.00 in back pay and accrued benefits and $300,000.00 in compensatory damages and front pay. Consistent with the holding of the United States Supreme Court in this case stating

that front pay is not subject to the statutory cap on damages contained in 42 U.S.C. § 1981a(b)(3), the Court must now determine the amount of front pay that Plaintiff should be awarded.

Additionally, after remand from the Sixth Circuit Court of Appeals, this Court determined the issue of liability for the state tort of intentional infliction of emotional distress in favor of Plaintiff on June 20, 2003. In accordance with this decision, the Court must determine whether the statutorily capped award of compensatory damages for the Title VII claim sufficiently compensated Plaintiff for her pain and suffering, or whether Plaintiff should be awarded further compensatory damages under the claim of intentional infliction of emotional distress, which is not subject to a statutory cap. The Court must also determine whether an award of punitive damages for the state tort claim is justified.

Plaintiff presented testimony from Phillip Wayne Blaylock, Plaintiff's brother, Laurie McCaleb, Plaintiff's daughter, John Wasilik, DuPont plant manager at the Memphis site, Michelle Millner, a former DuPont employee in the hydrogen peroxide and hydrogen cyanide areas, Laura Ann Norwood, a former DuPont employee in the hydrogen peroxide area, Dr. Richard Farmer, Plaintiff's treating psychiatrist, Dr. Thomas Depperschmidt, a forensic economist, and Sharon Pollard. Defendant presented testimony from John Wasilik, Dr. Owen Nelson, an expert witness in the area of psychology[1], Dr. Barbara Long, an expert witness in the area of psychiatry, and Dr. Mary Baker, an expert labor economist.

## I. FINDINGS OF FACT

Plaintiff was employed at DuPont from August 8, 1977 until February 29, 1996. She worked as an operator in DuPont's hydrogen peroxide unit from July, 1988 until February 29, 1996. (Stipulations[2] A2–5.) Plaintiff was a good worker. (Trial Transcript[3] at 157.) She took pride in her job and planned her life and her retirement around it. (Tr. at 156.) Plaintiff testified that since she lost her job and her career she feels like she lost the station in life that she had earned. (Tr. at 157.) Plaintiff also believes she never made a difference at DuPont because although she reported the harassment, she no longer has a job, while the men who harassed her still have their jobs. (Tr. at 157.) Plaintiff testified that but for the discrimination against her, she would have continued her employment at DuPont. (Tr. at 158.) Plaintiff believes she would ultimately retire at age 65 if she were able to work today. (Tr. at 197.) However, she testified that she would not be able to return to work at DuPont now. She does not believe she would be safe there because the men who harassed her are still on the site and the managers who allowed the harassment to continue are still in charge. (Tr. at 163.) At the present time, Plaintiff also does not believe she is able to work somewhere else.

### A. Plaintiff's Condition Since Leaving DuPont

Plaintiff described her own mental and emotional condition during the damages hearing. She testified, "It takes all my

---

1. The parties agreed that Dr. Nelson was not available for trial. Therefore, his deposition testimony was admitted at trial in lieu of his appearance.

2. Citations to the Stipulations filed in open court on July 21, 2003 will be referred to hereinafter as "Stip."

3. Citations to the Trial Transcript will be referred to hereinafter as "Tr."

efforts to keep my head above water with normal everyday activity. Anything other than going about everyday activities and responsibility will put me in a tailspin." (Tr. at 158.) She "had always been an organized person and had [her] life well planned," but now she has problems concentrating for more than two hours and "can't seem to stay undepressed or feel safe long enough to be the way [she] was." (Tr. at 158–159.) She falls behind just keeping her house clean and organized and her daughter must come over to help her. (Tr. at 159.) Plaintiff described herself as "[d]epressed, angry, irritable, lost, without purpose." (Tr. at 179.)

Plaintiff is afraid to run into anyone who worked at DuPont, so she plans everything she does, including simply getting in and out of Goldsmith's at the mall without going through the mall hallways. (Tr. at 160.) She will not shop in the Frayser or Millington areas because most of the DuPont employees live in that geographic area. (Tr. at 160.) Plaintiff testified that she once saw Rory Bricco in a store and she was so scared her heart was racing and she broke out in a cold sweat. She left without purchasing the items in her basket. (Tr. at 161.) Plaintiff will not go to a restaurant without a member of her family. (Tr. at 161.) She has nightmares on a weekly basis, sometimes involving Steve Carney. (Tr. at 162–163.) Since the harassment at DuPont, Plaintiff also gets sick, nauseous, breaks out in cold sweats, and is easily startled by noises. (Tr. at 181–182.) She has had problems getting out of bed in the morning for six of the last eight years. (Tr. at 875.) She "actually had periods when [she] would go for days without brushing [her] teeth or taking a shower." (Tr. at 182.) She presently takes Buspar to help with her anxiety and Ambien to help her sleep. (Tr. at 183.) Plaintiff testified that prior to the harassment at DuPont, she never had problems with anxiety, startled responses, anger, frustration, embarrassment, humiliation, depression, taking care of herself, or grooming. (Tr. at 181.)

Plaintiff also does not trust other people or corporations, nor does she have confidence in supervisors. When asked during the hearing if she could return to work anywhere, Plaintiff responded "I can't do it." After DuPont suggested last year that she return to work, Plaintiff testified that she contemplated suicide. (Tr. at 185.)

Plaintiff's brother and daughter also observed that Plaintiff underwent significant changes after the harassment at DuPont. Plaintiff's brother, Phillip Wayne Blaylock, described her as having a very strong work ethic and stated that she was driven to better herself. (Tr. at 35–36.) He testified that Plaintiff liked her job at DuPont, felt like she was doing something worthwhile, and took a lot of pride in her job. (Tr. at 45.) As a result of her job satisfaction, he believed she had a high sense of self-esteem. (Tr. at 46.) He described changes in her from December, 1994 through the present. He testified that prior to the problems she experienced at DuPont, Plaintiff was very assertive and good with people. She did not have a lot of crying episodes or depression. (Tr. at 41.) He testified that now she frequently cries, when she goes out she is always looking over her shoulder, she has become guarded even around her family, and she does not focus on completing projects that she starts. (Tr. at 41–44.) He also testified that she no longer trusts supervisors to do what they say they will do. (Tr. at 50.)

Plaintiff's Daughter, Laurie McCaleb, also testified as to the changes she observed in her mother since the incidences at DuPont. She described her mother as a

woman whose number one priority was work. (Tr. at 59.) Ms. McCaleb testified that Plaintiff, a single mother, "was always very proud to be able to take care of me on her own, the sense of accomplishment. She is very smart and she was working so hard towards her retirement, and that just—she lost that is the main thing, just her pride and retirement goals." (Tr. at 66).

Since the harassment she experienced at DuPont, Ms. McCaleb testified that Plaintiff now becomes agitated and angry sometimes. (Tr. at 59–60.) Her mother is always looking around and wondering if someone is following her. (Tr. at 61.) Plaintiff is much better outside of Memphis because she can have fun and be herself without looking over her shoulder. (Tr. at 61.) She testified that her mother can not stay focused or keep the household running, whereas she used to keep a spotless house. (Tr. at 62–63.) She does not have a garden this year, though she used to have quite a large garden, because she is not able to keep up with it. (Tr. at 63.) On some days, her mother will not get out of bed. (Tr. at 64.) Ms. McCaleb confirmed that Plaintiff has trouble sleeping and has nightmares. (Tr. at 68–69.)

In terms of her current activities, Ms. McCaleb testified that her mother shops at Goldsmith's, has organized dinners for Macon Methodist, the church she attends, spends a little bit of time helping church members get to and from services or the doctor, and has occasionally attended church services with Ms. McCaleb at Hope Presbyterian church. (Tr. at 74–75.) Plaintiff spends a good bit of her time every day doing household chores, including occasionally helping to feed and water the cattle, paying the bills, taking care of the farm paperwork, and doing the family shopping. (Tr. at 77, 79, 204–206.) Plaintiff has previously assisted her daughter once a week in doing housework for an elderly woman. (Tr. at 76–77.) Ms. McCaleb testified that Plaintiff used to play Bunco once a week with her friends. (Tr. at 80.)

Plaintiff also testified about her current activities. Plaintiff attends Macon Methodist church, a church of about forty-five members, where she feels safe. (Tr. at 173.) She is the treasurer of the church and volunteers to help set up dinners. (Tr. at 174, 202, 206.) However, she stated that she would not go to a larger church, such as Hope Presbyterian, by herself. (Tr. at 175.) Plaintiff further testified that she can not focus on keeping her garden, which has prevented her from planting anything for the last two years. (Tr. at 175.) Plaintiff has taken a few trips with her family. (Tr. at 203–204.)

Other than helping her daughter clean homes for awhile after leaving DuPont, Plaintiff has not been employed since leaving DuPont, nor has she submitted applications for employment. (Tr. at 206.) She also has not been self-employed. (Tr. at 206.) Plaintiff affirms that from an intellectual and physical standpoint, she is employable. (Tr. at 207.)

## B. DuPont's Response to This Case

John Wasilik became the DuPont plant manager at the Memphis site in September of 1997. (Tr. at 89.) As such, he has no firsthand knowledge of the harassment that occurred at the Memphis site while Plaintiff was an operator. (Tr. at 89.) He testified that the previous plant manager investigated Plaintiff's allegations. (Tr. at 90.) Mr. Wasilik does not believe any disciplinary or corrective action has been taken as a result of the actions of the DuPont hydrogen peroxide employees. (Tr. at 91.) He personally has never taken any disciplinary action against any DuPont employees to correct problems based on

the findings of this Court, the Sixth Circuit, or the Supreme Court. (Tr. at 90.)

On May 29, 1998, in response to an article in *The Commercial Appeal* and the Sixth Circuit's decision in this case, Mr. Wasilik sent a memo to all of the employees at the Memphis plant. (Tr. at 100.) In the memo, Mr. Wasilik expressed his strong disagreement with the article in *The Commercial Appeal* and stated that he was "deeply disappointed" in the rulings of this Court and the Sixth Circuit in the case. (Trial Exhibit[4] 1.) Mr. Wasilik also expressed his belief that members of management followed DuPont's policy and acted responsibly to investigate and resolve Plaintiff's issues. (Tr. Ex. 1.)

At the damages hearing, Mr. Wasilik explained that he believes DuPont employees behave respectfully towards one another in the overwhelming majority of instances and management takes appropriate follow-up action when they are aware of disrespectful behavior. (Tr. at 101.) He also testified that the management at the time Plaintiff was being harassed "wasn't aware of how to, number one, identify a case of disrespectful behavior and wasn't thoroughly trained in how to investigate it and take the appropriate course of action." (Tr. at 102.) He stated that today a policy is in place at DuPont and the managing process is also in place to deal with issues of workplace harassment. (Tr. at 102.) However, he also acknowledged that in his memo the management of DuPont did not take the blame for the lack of training that allowed Plaintiff to be harassed, rather the memo expressed his disagreements with the courts' rulings and informed DuPont's employees that he believed management had acted responsibly. (Tr. at 103–104.)

Plaintiff testified that she received a copy of this memo and was devastated. (Tr. at 165.) According to Plaintiff, prior to receiving the memo she had a "flicker of hope" that she could return to her job after the Sixth Circuit issued its opinion in this case. (Tr. at 165.) However, she understood Mr. Wasilik's subsequent memo to mean "that he believes that DuPont management did everything the right way and that ... given the chance to do it again, they would do it the same way." (Tr. at 166.)

Michelle Millner, a DuPont employee who ceased working at the Memphis plant in December of 2000, testified that after receiving Mr. Wasilik's memo she believed "it was going to be open season on females ... all these guys had their jobs, but Sharon was gone, and I just had to watch my step." (Tr. at 123.)

## C. Former DuPont Hydrogen Peroxide Employees

John David Walker was one of the individuals who worked on Plaintiff's shift in the hydrogen peroxide unit and participated in the harassment. (Tr. at 92.) Mr. Walker successfully bid from the hydrogen peroxide unit into the hydrogen cyanide unit in August, 1996. (Stip. C3; Tr. at 92.) Pursuant to DuPont policy, job openings are filled by the person who bids for the position and has the most plant seniority.[5] (Tr. at 92.) Mr. Walker became an operator in the hydrogen cyanide unit effective January, 1998. (Stip.C4.) Mr. Walker became an operator when DuPont restructured the role of the operator and eliminat-

---

4. Citations to exhibits used at trial will be referred to hereinafter as "Tr. Ex.", with a page number reference as needed.

5. Plaintiff would have more plant seniority than Mr. Walker were she still employed at DuPont. (Tr. at 93.)

ed the assistant operator position. (Tr. at 471.)

DuPont sold its hydrogen peroxide unit to Atofina on October 10, 1998. (Stip.A7.) John David Walker is the only person from Plaintiff's shift who is still a DuPont employee. (Tr. at 94.) Employees of the hydrogen peroxide unit now owned by Atofina, including Rory Bricco and Steve Carney, must come onto the DuPont premises on a regular basis because the companies share the same gate and the Atofina employees must walk through the plant to access the hydrogen peroxide process area. (Tr. at 93.) Ms. Norwood testified that the Atofina employees, including Steve Carney, also cook and eat with a group of DuPont employees in the DuPont areas. (Tr. at 342.) Mr. Wasilik testified that, to the best of his knowledge, the Atofina employees do not use the same lunch room as the DuPont employees,(Tr. at 111), which would be against DuPont's policy, (Tr. at 342).

## D. DuPont Pension and Retirement Plan

DuPont has a non-contributory Pension and Retirement Plan that provides for "Incapability Retirement". (Stip.B1.) The incapability supplement is designed to replace a portion of the income eligible employees are unable to earn when performing the duties of their particular position at DuPont. (Stip.B6.) DuPont makes all of the contributions to fund the Pension and Retirement Plan. (Stip.B2.) The plan is not funded by insurance, nor does it arise from the collective bargaining agreement. (Tr. at 482.) Plaintiff currently receives Incapability Retirement benefits from DuPont, which consists of (1) a pension benefit of one thousand sixty-three dollars ($1,063.00) per month and (2) an incapability supplement of three hundred seventy-one dollars ($371.00) per month.

(Stip.B3.) These payments have been funded solely by DuPont. Plaintiff has made no contribution to the Incapability Retirement plan. (Stip.B3.)

## E. Plaintiff's Medical Condition

Both Plaintiff's psychiatrist, Dr. Richard Farmer, and Defendant's psychiatrist, Dr. Barbara Long, agree that Plaintiff suffers from a psychiatric condition that causes her to be, among other things, anxious and depressed. However, they disagree as to her exact diagnosis.

Dr. Farmer has treated Plaintiff since the trial of this case in 1997. (Tr. at 237.) DuPont originally hired him to perform a return to work evaluation, but he has since become Plaintiff's treating physician. (Tr. at 280, 319.) Dr. Farmer testified that Plaintiff suffers from a chronic form of Post–Traumatic Stress Disorder ("PTSD"). (Tr. at 237.) Dr. Farmer described PTSD an anxiety disorder "produced by an acute or chronic stressful situation that results in a cascading effect of biological and psychological effects producing three primary symptom pictures, and they include avoidance, re-living the situation that was primarily the cause of the patient's anxiety and depression and increased startled response." (Tr. at 237–238.) Dr. Farmer testified that Plaintiff meets all of the criteria for the PTSD diagnosis as set forth in the Diagnostic and Statistical Manual IV ("DSM IV"). (Tr. at 265–268.)

Dr. Farmer also diagnosed Plaintiff with "severe major depressive disorder, which at times appears to be a less depressed state . . . call[ed] dysthymia." (Tr. at 249.) Dr. Farmer described the cause of Plaintiff's PTSD and depression as "a series of interpersonal insults producing humanitive stress syndrome that led to an acute case of PTSD." (Tr. at 249–250.) The stresses include the way she was treated and isolat-

ed at DuPont by her male co-workers. (Tr. at 250.)

Both of Dr. Farmer's diagnoses are Axis I diagnoses, which means they are major psychiatric disorders of severe proportions that require treatment of some kind. (Tr. at 270.) Dr. Farmer estimates Plaintiff's chances of a complete recovery from PTSD at twenty or twenty-five percent, maybe lower. (Tr. at 269.) Dr. Farmer believes that Plaintiff "cannot under any circumstances return to work at DuPont." (Tr. at 273.) Dr. Farmer also testified that he believes it is too risky for Plaintiff to return to work anywhere because she will be exposed to situations that remind her of what happened at DuPont and she could have an anxiety attack and become severely depressed. (Tr. at 278, 324–325.) Dr. Farmer believes Plaintiff would become suicidal if she were forced to return to work at DuPont or elsewhere. (Tr. at 274, 278–279.)

Dr. Long disagrees with the PTSD diagnosis.[6] Dr. Long performed an independent psychiatric evaluation in 2002 at the behest of DuPont. She testified that she believes Plaintiff suffers from two different Axis I disorders, specifically dysthymia and somatoform disorder.[7] (Tr. at 553.) Dysthymia is a chronic depression of less severity than a major depression, which Dr. Long believes was caused by the protracted litigation in this case, cognitive distortions, and Plaintiff's lack of gainful employment. (Tr. at 553–554.) Dr. Long does not believe Plaintiff suffers from dysthymia as a result of her work environment at DuPont. (Tr. at 556.) From a review of Dr. Paul Hill's records, Dr. Long concluded that Plaintiff had an adjustment disorder following her experiences at DuPont and that the adjustment disorder had resolved by February, 1997. Therefore, Dr. Long concludes that Plaintiff's present dysthymic condition was not caused by the events at DuPont. (Tr. at 557.) Dr. Long also diagnosed Plaintiff under Axis II as being dependant, avoidant, and obsessive compulsive. (Tr. at 558.) Dr. Long believes Plaintiff had these personality traits prior to her employment with DuPont. (Tr. at 558.)

Dr. Long believes Plaintiff is capable of returning to work at DuPont. (Tr. at 578–579.) Dr. Long does not believe Plaintiff suffers from a psychiatric condition that would prevent her from returning to work. (Tr. at 579, 633.) Despite this belief that Plaintiff does not suffer from such a psychiatric condition, Dr. Long curiously testified that "this lady needs therapy and needs medication. She desperately needs treatment." (Tr. at 602.)

Dr. Farmer rejects the diagnosis of avoidant personality disorder because Plaintiff did not have an avoidant personality in childhood or adolescence, which he testified is required for a diagnosis of avoidant personality disorder. (Tr. at 244–245.) Dr. Farmer finds the avoidant features of Plaintiff's personality consistent with his diagnosis of PTSD. (Tr. at 248.)

### F. Plaintiff's Cooperation with Therapy

Plaintiff feels like she has cooperated by going into therapy. (Tr. at 168.) At the

6. Dr. Nelson, who administered several psychological tests at the request of DuPont, also stated that his test results did not warrant a diagnosis of PTSD. (Nelson Dep. Exh. 4 at 7.)

7. Dr. Long stated that the term somatoform disorder is used to describe an individual who has physical or medical complaints that have no medical etiology. (Tr. at 557–558.) Dr.

Nelson's report also indicated Plaintiff suffers from "somatic distress." (Nelson Dep. Exh. 4 at 4.) However, Dr. Long testified that the diagnosis of somatoform disorder was not pertinent to the questions in this case, but she included it for purposes of a complete diagnosis. (Tr. at 558.)

behest of DuPont, she saw three separate doctors, specifically Dr. Janet Hill, Dr. Steinberg, and Dr. Richard Farmer. (Tr. at 168–170.) She took Effexor, as prescribed by her personal physician, Dr. Brody. (Tr. at 171.) Dr. Brody referred her to Dr. Paul Hill, who monitored Plaintiff's medications until 1999.

Dr. Janet Hill, Dr. Paul Hill, and Dr. Farmer have all recommended that Plaintiff undergo a regular and consistent regimen of psychotherapy. (Tr. at 209, 291.) However, Plaintiff has been resistant to psychotherapy. (Tr. at 295.) Dr. Farmer, Plaintiff's treating physician, testified that he has not insisted that she come in regularly for therapy because it causes her discomfort in the form of anxiety episodes and depression before each visit and for up to two weeks following each visit. (Tr. at 238–239.) He also testified that she has never disregarded his opinions and if he asks her to come in for a visit, she does come in. (Tr. at 325.) Dr. Farmer further noted that one of the sources of Plaintiff's discomfort is a matter of trust because everything he writes down is seen by each person connected with this case. (Tr. at 239.) According to Dr. Farmer, the painfulness of therapy may be a valid reason to avoid therapy in some cases. (Tr. at 292–293.) Dr. Long does not believe this is a legitimate reason to avoid therapy. (Tr. at 574.)

Plaintiff is also resistant to taking antidepressants because of the side effects. (Tr. at 212–213, 296.) Plaintiff noted that while she was taking Topamax, she sat down to play the piano in church one morning and when she looked at the notes, she could not play them. (Tr. at 213.) Dr. Farmer confirmed that Plaintiff could not tolerate the Topamax because of cognitive side effects. (Tr. at 256.)

## II. CONCLUSIONS OF LAW

▮ The Court previously made a finding of discrimination in this case. *Pollard v. E.I. DuPont de Nemours, Inc.*, 16 F.Supp.2d 913 (W.D.Tenn.1998). "Once discrimination is found, reinstatement should be granted absent exceptional circumstances." *In re Lewis v. Sears, Roebuck & Co.*, 845 F.2d 624, 630 (6th Cir. 1988). Front pay is an alternative remedy to reinstatement and is generally awarded when reinstatement would be "inappropriate or infeasible." *Suggs v. ServiceMaster Educ. Food Mgmt.*, 72 F.3d 1228, 1234 (6th Cir.1996). "It is not enough that reinstatement might have 'disturbing consequences,' that it might revive old antagonisms, or that it could 'breed difficult working conditions' [because] relief is not restricted to that which will be pleasing and free of irritation." *Farber v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1396 (6th Cir.1990). Exceptional circumstances can be found "only upon the facts presently obtaining and not based upon historical circumstances which may no longer be present when the proposed reinstatement occurs." *Id.*

Both parties in this case have directed the Court's attention to two district court opinions discussing factors potentially relevant to the question of whether reinstatement or an award of front pay is the appropriate remedy here. *Prine v. Sioux City Cmty. Sch. Dist.*, 95 F.Supp.2d 1005 (N.D.Iowa 2000); *Ogden v. Wax Works, Inc.*, 29 F.Supp.2d 1003 (N.D.Iowa 1998). In *Prine* and *Ogden*, the court suggested the following considerations: "(1) whether the employer is still in business; (2) whether there is a comparable position available for the plaintiff to assume; (3) whether an innocent employee would be displaced by reinstatement; (4) whether the parties agree that reinstatement is a viable remedy; (5) whether the degree of

hostility or animosity between the parties—caused not only by the underlying offense but also by the litigation process— would undermine reinstatement; (6) whether reinstatement would arouse hostility in the workplace; (7) whether the plaintiff has since acquired similar work; (8) whether the plaintiff's career goals have changed since the unlawful termination; and (9) whether the plaintiff has the ability to return to work for the defendant employer—including consideration of the effect of the dismissal on the plaintiff's self-worth." *Prine*, 95 F.Supp.2d at 1008–1009, *Ogden*, 29 F.Supp.2d at 1010 (internal citations omitted).

▮ Assuming the Court decides to make an award of front pay rather than reinstate Plaintiff, the Court must put Plaintiff in the same position she would have occupied in the absence of the discrimination without creating a windfall. *Suggs*, 72 F.3d at 1234. The Court must also determine whether Plaintiff has mitigated her damages. "Title VII claimants have a duty to mitigate an award of front pay." *Id.* However, it is the employer's burden to show that a plaintiff "failed to use reasonable care and diligence" to mitigate damages. *Ford v. Nicks*, 866 F.2d 865, 873 (6th Cir.1989). "An employee is not required to go to heroic lengths in attempting to mitigate [her] damages, but only to take reasonable steps to do so." *Id.*

The Sixth Circuit has stated the following factors are relevant to the question of calculating front pay: "(1) the employee's future in the position from which she was terminated; (2) her work and life expectancy; (3) her obligation to mitigate her damages; (4) the availability of comparable employment opportunities and the time reasonably required to find substitute em-

ployment; (5) the discount tables to determine the present value of future damages; and (6) other factors that are pertinent in prospective damage awards." *Ford*, 866 F.2d at 873.

## III. ANALYSIS

The analysis of an award of damages in this case contains several elements. First, on the question of front pay the Court must determine whether Plaintiff can be returned to work at DuPont. Assuming she can not be returned to work and an award of front pay is appropriate, the Court must determine whether she has mitigated her damages. The Court must then determine the amount of front pay Plaintiff should be awarded after weighing the widely differing expert testimonies. Finally, the Court must determine whether an increased award of compensatory damages under the theory of intentional infliction of emotional distress is necessary to make Plaintiff whole.

### A. Front Pay

On the issue of front pay, the Court must determine whether Plaintiff is able to return to work at DuPont or elsewhere, whether she has attempted to mitigate her damages by going through therapy or taking medication, and the amount of damages, if any, that should be awarded to Plaintiff for her lost earnings.

#### 1. Return to Work

▮ The Court has carefully considered all of the testimony presented during the hearing, in particular the testimonies of Dr. Farmer and Dr. Long. The Court concludes that Plaintiff can not and should not be returned to work at DuPont or anywhere else.[8] Regardless of the differences

---

8. DuPont has argued for reinstatement, but has not argued that Plaintiff can or should be

employed elsewhere. Even if the Court had determined that Plaintiff could return to work

in their diagnoses, both Dr. Farmer and Dr. Long believe Plaintiff suffers from multiple psychiatric disorders or conditions. The doctors' disagreements center around the severity of her symptoms and the nature of her illnesses. For purposes of determining whether Plaintiff can return to work and awarding damages, the Court need not determine the exact nature of Plaintiff's condition. It is enough for the Court to determine, which it does here, that regardless of the name assigned to Plaintiff's condition she suffers from psychological disorders that cause her to have severe anxiety, depression, and other symptoms that inhibit her everyday activities, interfere with her interpersonal relationships, and prevent her from working.[9]

The Court also does not believe Plaintiff is a malingerer. She is an individual who has been tormented and now has a difficult time getting herself out of bed in the morning. She has difficulty keeping up with everyday activities such as paying bills and tending to a garden. She fears holding a job because she is afraid her supervisors will not protect her from harassment by her co-workers. She has extreme difficulty leaving the comfort zones of her home and small church because she dreads even the idea of encountering her former co-workers from the peroxide area. She cries and also has nightmares about her experiences at DuPont. Dr. Farmer believes Plaintiff would become suicidal if she were returned to work at DuPont or elsewhere. Dr. Farm-

er has not released her to return to work. Although it is clear that Plaintiff is not an invalid, and as shown by Defendant she can accomplish many daily tasks to a certain degree or with assistance from family, it is equally clear to the Court that she does not function at a level that would allow the Court to return her to work at DuPont.[10]

Furthermore, throughout the entire history of this case, DuPont has failed to appreciate the harsh treatment Plaintiff endured at the hands of her co-workers, has failed to accept any responsibility for such treatment, and has failed to assure Plaintiff and the Court that she would be safe if she returned to work at DuPont. Prior to her termination, Plaintiff's complaints were repeatedly ignored by her supervisors. After holding a bench trial in this case, this Court issued an opinion condemning DuPont's inaction. The Sixth Circuit Court of Appeals then reviewed this case and expressed its "moral outrage" that DuPont permitted Plaintiff to be harassed in such a manner. Yet, DuPont has maintained the position that it acted appropriately in response to Plaintiff's repeated complaints.

The letter sent from Mr. Wasilik to all DuPont Memphis employees following the issuance of the Sixth Circuit's decision and the appearance of an article in *The Commercial Appeal* regarding this case is perhaps the most damning evidence of DuPont's callous attitude. Although the

---

someplace other than DuPont, DuPont has presented no evidence that comparable jobs are available to Plaintiff.

9. It should also be noted that Judge Turner previously issued an opinion in an ERISA denial of benefits case litigated between Plaintiff and DuPont, stating that "there is overwhelming evidence in the record that Plaintiff could not return to work at DuPont." *Pollard v. E.I. DuPont de Nemours, Inc.*, Case No.

2:98–02147 Tu/A (W.D.Tenn. March 30, 1999).

10. Dr. Long offers a differing opinion of Plaintiff's capabilities. Dr. Long is a well-trained and respected psychiatrist. However, Plaintiff seriously and substantially challenged the interview process utilized by Dr. Long, calling into question the conclusions she reached. (*See, e.g.,* Tr. at 866.)

letter states that DuPont maintains the "highest values for the respectful treatment of people throughout DuPont" and discusses DuPont's policy against discrimination, the letter also contains the following comment on Plaintiff's case and the actions of DuPont's management:

> We have a policy against discrimination and harrassment [sic] in any form, and investigate thoroughly any allegations. From my review of this case, I strongly believe the policy was followed, and members of Management from First–Line Supervisor to the Plant Manager acted responsibly to investigate and attempt to resolve the issues.

> We chose to appeal Judge McCalla's original ruling because we felt strongly we were right in what we did to resolve this case, and disagreed with his conclusions. We knew we faced an uphill battle in any appeal, but *our fundamental conviction that Management acted responsibly to resolve this case drove us forward. That conviction remains strong today, despite the adverse ruling* [of the Sixth Circuit Court of Appeals]. It is my belief that DuPont will contest vigorously any future court proceedings in this case.

> \*　　\*　　\*　　\*　　\*　　\*

> Again, to summarize, I am deeply disappointed in the article and the outcome of the court proceeding.

(Tr. Exh. 1.) (Emphasis added). As this letter shows, DuPont clearly fails to understand that it did not respond appropriately to protect Plaintiff from harassment by her co-workers. The Court is not confident that even today DuPont's management recognizes the severity of the harassment Plaintiff endured or that it perceives a problem with the managerial lapses which allowed the harassment to continue unabated for such an extended period of time. The Court can not reasonably return Plaintiff to work in an environment where she can not look to her supervisors to protect her.

Furthermore, the Court would not even consider returning Plaintiff to work at DuPont without some assurance that Plaintiff would not continue to be subjected to sexual harassment. John David Walker, one of her tormentors, still works at DuPont. Plaintiff's former co-workers, including Steve Carney, work in the hydrogen peroxide area now owned by Atofina. However, they still are required to access the DuPont plant to go to work for Atofina. Several witnesses testified that Plaintiff's former co-workers come to the DuPont site to eat in the break room. While Mr. Wasilik testified that this is against DuPont's policy, he never stated that it does not happen. Moreover, although the testimonies of Ms. Millner and Ms. Norwood were quite dated, and the Court does not weigh them heavily, both women testified that the negative attitude of the male operators at DuPont towards their female co-workers continued after both this Court's opinion and the Sixth Circuit's opinion in this case.

Given this analysis, the Court finds that Plaintiff can not be returned to work at DuPont. Under the *Prine* and *Ogden* considerations, the Court finds that factors 5, 6, and 9 weigh extremely heavily against reinstating Plaintiff at DuPont.

### 2. Mitigation/Lack of Diligence

The Court also finds that Plaintiff has not shown a lack of diligence by failing to participate in regular psychotherapy sessions or take medications. The Court first notes that at the behest of DuPont, Plaintiff saw three separate doctors. Dr. Farmer has continued to treat her, albeit quite sporadically, for the past several years. Plaintiff has taken both Effexor and Topomax as prescribed by her doc-

tors. She was taken off these medications because she experienced adverse side effects such as decreased cognitive ability and significant weight gain. Furthermore, Dr. Farmer testified that each time he has asked her to come in for treatment, Plaintiff complied with his request. Thus, the Court finds that there is sufficient evidence of Plaintiff's willingness to attend treatment and take medications when her doctors require it.

The Court also accepts Dr. Farmer's insight into Plaintiff's legitimate reasons for resisting therapy at this time. Although Dr. Farmer believes regular psychotherapy would be helpful to Plaintiff, he also testified that it has been very painful for her. Plaintiff suffers both before and after her visits. Dr. Farmer testified that her chances of full recovery are only twenty to twenty-five percent, possibly lower. Furthermore, Dr. Farmer believes one of the reasons Plaintiff resists therapy is due this litigation and the fact that each person involved in this case will see his notes from Plaintiff's sessions. Therefore, Plaintiff has difficulty trusting her psychiatrist. As a result of these factors, Dr. Farmer has not required her to undergo treatment.

■ As noted above, "[a]n employee is not required to go to heroic lengths in attempting to mitigate [her] damages, but only to take reasonable steps to do so." *Ford*, 866 F.2d at 873. The Court finds that Plaintiff has taken reasonable steps to mitigate her damages, including seeing several physicians and taking medications when required. It would be unreasonable for the Court to require Plaintiff to take medications that impair her cognitive ability. It would also be unreasonable to require Plaintiff to undergo painful therapy that causes her further discomfort, stress, anxiety, and depression with little chance of recovery. For all of the above reasons, the Court finds that Plaintiff has not failed

to mitigate her damages by undergoing a consistent regimen of psychotherapy.

### 3. Damages

Having resolved the questions of return to work and mitigation in favor of Plaintiff, the Court must make an award of front pay. The Court resolves the disputes of the expert economists as follows:

#### a. Age of Retirement

■ The Court will award front pay to Plaintiff through age 65 because the Court finds it is more likely that she would have retired at age 65 than at age 58. The Court found Plaintiff to be a credible witness throughout the original trial and the recent damages hearing. She testified that she would have worked until she reached age 65.

DuPont argued that during the 1997 trial, Plaintiff expressed a desire to work only until age 58. For Plaintiff, age 58 is significant because under DuPont's retirement plan the sum of her age and years of service would equal 85, which would make her eligible for a full pension. However, Plaintiff's hope of retiring at age 58 depended upon Plaintiff having amassed over one million dollars in her 401(k) retirement savings count. Given the market downturn of the last several years, her projected retirement savings have not materialized and her account presently contains approximately three hundred thousand dollars. These recent economic conditions make it highly unlikely that she would have retired at age 58. Furthermore, Plaintiff testified that her husband is six years younger and would not have been able to retire at that time.

DuPont also argued that the average employee in the peroxide area retires prior to age 65. (Tr. Ex. 22.) However, the evidence presented during the hearing suggests that DuPont's statistics for per-

oxide employees actually includes former DuPont employees who did not really retire. When DuPont sold its peroxide unit to Atofina, certain employees "retired" from DuPont, but continued to work for the peroxide unit now owned by Atofina. These employees appear to have been included in DuPont's charts, making the charts less reliable representations of the operator retirement ages.

### b. Discount Rate

██ The Court will apply a two percent (2%) net real discount rate. Dr. Depperschmidt testified that he utilized a two percent rate for three reasons. First, it is the rate accepted by most forensic economists. Second, the rate falls within a range approved by the Supreme Court in *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983). Third, his own analysis of conservative investment instruments leads to a discount rate of approximately two percent.

Dr. Baker argued in favor of applying a higher four percent discount rate, which assumes the future income stream is riskier and thereby decreases its present value. Dr. Baker assumed various business and market contingencies increase the risk associated with the income stream, such as a plant sale or layoffs, and also personal contingencies such as death, disability, voluntary exit from the labor force, or eligibility for an unreduced pension prior to age 65.

Mr. Wasilik directly refuted Dr. Baker's proposed business contingencies. He testified that DuPont has no plans to close the Memphis plant and that as long as the plant remains open DuPont will need to employ operators. (Tr. at 491–493.) With respect to the personal contingencies, Plaintiff's life expectancy exceeds age 65 and she testified that she would have worked until age 65. Moreover, Dr. Baker could not identify the specific percentage increases in her discount rate that were attributable to each of the contingencies she identified. This renders it nearly impossible for the Court to weigh the significance of these various possibilities or their affect on the discount rate. Therefore, the Court finds the use of a four percent rate inappropriate in this case.

### c. Comparator or Cohort Analysis

██ The Court rejects cohort analysis in this case and uses John David Walker as a comparator from the year 2000 forward (i.e. after he became an operator in the hydrogen cyanide area and for which there is data available).[11] The Court concedes that both the cohort and comparator analyses contain significant flaws when applied in this case, in particular due to the fact that the hydrogen peroxide division at the Memphis plant has been sold to Atofina. There are no longer hydrogen peroxide operators at DuPont. Furthermore, there are no longer any eight-hour shift operators. Rather, all operators work twelve-hour shifts. No front pay analysis in this case can be perfect and it is the Court's goal to analyze the data that most

11. Dr. Baker agreed that Dr. Depperschmidt's estimation of Plaintiff's base pay through 1999 is "reasonable and appropriate" because it is a projection of Plaintiff's base pay using historical control room operator hourly wage rates. (Tr. at 666–667.) Dr. Baker disagrees with Dr. Depperschmidt's calculations from 2000 forward because of his use of Mr. Walker as a comparator. (Tr. at 667.)

Dr. Baker agrees that the 3.53% increase in base pay for 2002 and 2003 is appropriate. (Tr. at 667–668.) Dr. Baker also agrees that the 7.3% scheduled overtime allowance and the 1.5% scheduled shift premium used by Dr. Depperschmidt are within the "ballpark". (Tr. at 674.–675.)

closely approximates Plaintiff's future earnings. The Court finds that the comparator analysis using John David Walker more closely approximates Plaintiff's work history at DuPont, particularly her history of working high amounts of unscheduled overtime.

Plaintiff was employed as an operator at DuPont, as is Mr. Walker. Plaintiff and Mr. Walker formerly worked on the same shift in the hydrogen peroxide unit. Mr. Walker is the only former hydrogen peroxide employee who still works at DuPont. Plaintiff consistently worked significant amounts of overtime, as does/did Mr. Walker.[12] As Plaintiff testified, they worked about the same amount of overtime and generally alternated taking overtime opportunities. The Court believes it is fair to say that Plaintiff would have done at least as well at DuPont as Mr. Walker, who worked in hydrogen peroxide with Plaintiff and had thirteen years less seniority than Plaintiff at the time she left DuPont. In these ways the use of a comparator is reasonable. Therefore, the Court will analyze the question of front pay using John David Walker as a comparator.

The Court declines to use the cohort analysis proposed by Dr. Baker because it ignores Plaintiff's own work history in favor of a group average. While this method might be appropriate for an average employee, it is not appropriate with respect to Plaintiff. The Court is also concerned that the group average with respect to overtime hours fails to exclude outliers, such as employees receiving disability pay who do not work any overtime at all. Moreover, the article on cohort analysis authored by Michael Piette and Janet Thornton, and relied upon by Dr. Baker at trial, "demonstrate[s] the use of this approach in the calculation of economic damages *in large class action cases.*" (Tr. Exh. 44.) (Emphasis added). Plaintiff is an individual claimant, therefore, the Court questions the propriety of applying the cohort analysis in this case. Finally, the Court is not persuaded by DuPont's argument that Mr. Walker is a poor comparator because he initially bid into the hydrogen cyanide unit as an assistant operator in 1996. Mr. Walker is not a perfect comparator, but Dr. Baker's cohort analysis also is not a perfect comparator. In this case, the Court believes Mr. Walker's earnings more closely approximate Plaintiff's lost earnings.[13]

### d. Front Pay Award Date

"[F]ront pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001). The Court entered its Order and the Judgment in this case on August 20, 1998. Although the Court's Order

---

**12.** Although DuPont's statistics show an attempt to decrease plantwide unscheduled overtime, Mr. Walker has maintained consistently high amounts of unscheduled overtime.

**13.** The Court has adjusted the Normal Annual Earnings column of Dr. Baker's chart to reflect Dr. Depperschmidt's analysis. The Normal Annual Earnings yearly figure constitutes the sum of "projected average base earnings rate", scheduled overtime allowance ("SOA"), and scheduled shift premium ("SSP") from

Dr. Depperschmidt's July 21, 2003 report. (Tr. Ex. 16 at 7–12.) Additionally, because Dr. Baker's chart expresses unscheduled overtime hours as a percentage of Normal Annual Earnings, rather than as a percentage of base pay, the Court must adjust Dr. Depperschmidt's unscheduled overtime rate. Expressed as a percentage of Normal Annual Earnings, the Court will award unscheduled overtime pay at a rate of 36.56%. (Tr. Ex. 31 at 16.)

failed to increase the back pay award to reflect the time lapse between the October, 1997 trial and the August 20, 1998 entry of judgment, the Court can not revisit the issue at this time. According to the Supreme Court, front pay should be awarded for the period after the entry of judgment. Therefore, the Court will award front pay beginning August 21, 1998.

### e. Fringe Benefit Ratio

■ The Court agrees with Dr. Baker's assessment and will apply a fringe benefit ratio of six and seven hundredths percent (6.07%). There is no evidence that Plaintiff has lost any Social Security, OAS-DI, or Medicare Part A benefits as a result of her termination. Dr. Depperschmidt's testimony with respect to Medicare Part B was not conclusive on the issue of lost benefits and in any event lacked sufficient indicia of reliability under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Therefore, these amounts should not be included in the fringe benefit ratio.

### f. SIP Benefits

■ The Court agrees with Dr. Baker's analysis of Plaintiff's lost SIP benefits. Plaintiff should not receive past or future interest on the current balance of her retirement account because she has retained the current value of her SIP account since her termination. Thus, she has retained the ability to earn interest on the current balance of the account.

■ The Court finds that Plaintiff has lost the value of the employer contributions of three percent (3%) per year to her 401(k) account, with interest thereon through the date of the damages hearing. However, both Dr. Depperschmidt and Dr. Baker included the value of the lost employer contributions in the fringe benefit ratio. Therefore, the Court need not make a separate award for this amount. Plaintiff has also lost the value of past interest on the employer and employee 401(k) contributions that were not made. Dr. Baker set forth the amount of interest in Trial Exhibit 36. Consistent with her calculation, the Court will award ten thousand ninety-six dollars ($10,096.00) for past interest lost on the employer contributions.

The Court will not award future interest on any of the lost contributions because Plaintiff may invest the value of the Court's front pay award herself.

### g. Performance Based Compensation

■ Both Dr. Baker and Dr. Depperschmidt assume that Plaintiff would have received performance based compensation. Dr. Depperschmidt again used John David Walker as a comparator to determine Plaintiff's loss of performance based compensation. Dr. Baker used an average based on her cohort analysis. The Court will use Mr. Walker's award of performance based compensation for the years the data is available, specifically 2000 and 2001. The Court will apply a performance based compensation rate of 5.2%, as a percentage of normal annual earnings, based on the use of Mr. Walker as a comparator from 2000 forward.[14] The Court will calculate the value of the performance based compensation awards in the year in which they were paid, as in Dr. Baker's analysis.

---

**14.** As a practical matter, this ruling makes no significant difference in the front pay award as Dr. Baker testified that both she and Dr. Depperschmidt used the same rate of 5.2% to calculate performance based compensation. Dr. Baker simply disagreed with the use of Mr. Walker as a comparator to achieve that percentage. (Tr. at 690.)

### h. Adverse Tax Consequences

 Plaintiff incurred an early withdrawal tax liability in the year 1996 related to a loan she took from her 401(k) plan. She incurred this liability only as a result of her termination because she could not repay the loan. The proper amount of such an award would be the actual taxes paid. However, neither Plaintiff nor Dr. Depperschmidt provided the Court with this amount and the Court declines to speculate or adopt Dr. Depperschmidt's estimate. Further, the Court previously awarded back pay through August 20, 1998. Plaintiff incurred this tax liability in 1996, during the period for which the Court has already made a back pay award. The Court can not revisit the back pay question and will not include the amount of this tax liability in its front pay award.

 The Court also finds that Plaintiff should not be compensated for the adverse tax consequences of the lump sum front pay award. Dr. Depperschmidt's calculations included an amount intended to compensate Plaintiff for the adverse tax consequences of receiving a lump sum payment in one year, as opposed to receiving her salary and benefits on a yearly basis. Such an award would contradict the literature and case law on this topic. *Dashnaw v. Pena,* 12 F.3d 1112, 1113 (D.C.Cir.1994) ("[T]he general rule that victims of discrimination should be made whole does not support 'gross-ups' of backpay to cover tax liability."). Furthermore, Dr. Depperschmidt is not a tax expert and his calculation is merely an estimate that fails to account for tax planning that could be used to avoid some of the adverse tax consequences. As such, it does not meet the test for reliability set forth in *Daubert* and *Kumho Tire.*

### i. Incapability Pension Benefits

Plaintiff currently receives incapability retirement benefits from DuPont, which consists of (1) a pension benefit of one thousand sixty-three dollars ($1,063.00) per month and (2) an incapability supplement of three hundred seventy-one dollars ($371.00) per month. The parties have stipulated that both of these benefits are non-contributory and fully funded by DuPont. The plan is not funded by insurance and does not arise from a collective bargaining agreement. Therefore, DuPont argues the payments are not subject to the collateral source rule and should be used to offset any front pay award.

 At a minimum, the Court finds that any award should be offset by the $371.00 per month incapability supplement, in accordance with *Hamlin v. Charter Township of Flint,* 165 F.3d 426, 433–436 (6th Cir.1999). The incapability supplement is funded entirely by DuPont and is designed as income replacement because Plaintiff is incapable of performing the duties of the position of operator. An award that failed to offset the incapability supplement would provide Plaintiff duplicate recovery. Furthermore, although Plaintiff contests an offset for incapability retirement pension benefits, she does not appear to contest the offset for the incapability supplement in her post-trial submission.

 With respect to the $1,063.00 per month incapability retirement pension benefits, the Court also finds that this monthly payment is not subject to the collateral source rule and should be used to offset the amount of Plaintiff's front pay award. *Hawley v. Dresser Indus., Inc.,* 958 F.2d 720, 726 (6th Cir.1992). The incapability retirement pension has been funded solely by DuPont and Plaintiff would not receive this benefit if she had continued to work and receive a salary from DuPont through age 65. Therefore, an award that failed to

deduct the value of the incapability retirement pension would provide Plaintiff a duplicate recovery.

### j. Mitigation Earnings

Both parties agree that monies Plaintiff earned from housekeeping services should be deducted from Plaintiff's final award. The Court agrees. The Court will deduct the sum of one thousand two hundred dollars ($1,200.00).[15]

Based on the above findings, the Court awards front pay in the amount of one million four thousand three hundred seventy-four dollars ($1,004,374.00)[16]. Dr. Baker provided the Court and Plaintiff with an electronic copy of the spreadsheet used in her report to calculate the amount of damages in this case. The spreadsheet, modified to reflect the Court's findings discussed above, is appended to this opinion.

### B. Compensatory Damages

■ On the question of compensatory damages, the Court must determine what amount of damages can make Plaintiff whole and compensate her for her pain and suffering due to DuPont's intentional infliction of emotional distress. Defendant has taken away Plaintiff's sense of self-esteem. Plaintiff, formerly an outgoing, confident, self-assured, and professionally successful individual, has to a large degree lost each of these attributes due to the humiliating and degrading sexual harassment she suffered at DuPont and which her supervisors repeatedly failed to stop despite her requests for help. The Court must compensate her for this mental destruction and quantify in dollars the loss of Plaintiff's sense of self worth.

■ After the October, 1997 trial in this case, the Court awarded Plaintiff the statutory maximum under Title VII of $300,000.00. At the time, the Court noted that this amount was "insufficient to compensate plaintiff for the psychological damage, pain, and humiliation she has suffered." *Pollard,* 16 F.Supp.2d at 924 n. 19. There is no statutory cap on an award of compensatory damages for intentional infliction of emotional distress, a claim for which DuPont is now liable. Consistent with the Court's August 20, 1998 Order, the Court finds that a larger award of compensatory damages is appropriate in this case.

The Court makes a total award of compensatory damages in the amount of one million two hundred fifty thousand dollars ($1,250,000.00). The Court's previous award of $300,000.00 in compensatory damages must be deducted from the present award. Defendant is, therefore, ORDERED to pay Plaintiff compensatory damages in the amount of nine hundred fifty thousand dollars ($950,000.00).

## IV. PUNITIVE DAMAGES

In the Court's August 20, 1998 Order, the Court was prohibited from awarding punitive damages based on the statutory cap in 42 U.S.C. § 1981a(b)(1). The Court also noted, "For the record, however, the Court finds that punitive damages are justified in this case, as defendant has 'engaged in a discriminatory practice with

---

15. Dr. Baker offset only $1,200.00 against the front pay award, although Plaintiff earned $2,700.00, because some of Plaintiff's earnings occurred prior to August, 1998. As Dr. Baker noted, a front pay award dating from August 21, 1998, should not include an offset for income earned prior to that date.

16. This total reflects the Cumulative Present Value of Loss with Offset from the last column of Dr. Baker's chart ($994,278.00) plus the value of past interest lost on employer 401(k) contributions ($10,096.00).

malice or with reckless indifference to the federally protected rights of an aggrieved individual,' 42 U.S.C. § 1981a(b)(1), and, absent the statutory cap, the Court would have awarded punitive damages based on DuPont's repeated failure to remedy this egregious situation." *Pollard,* 16 F.Supp.2d at 924 n. 19.

▮ On June 20, 2003, the Court determined the issue of liability for the tort of intentional infliction of emotional distress in favor of Plaintiff. Punitive damages arising from this state tort claim are now available in this case should the Court find by clear and convincing evidence that Du-Pont's conduct was intentional, fraudulent, malicious, or reckless. *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 (Tenn. 1992). For the reasons stated in the Court's previous orders in this case, the Court finds by clear and convincing evidence that punitive damages are justified. By ignoring Plaintiff's repeated complaints and requests for help, DuPont acted intentionally or recklessly to disregard a substantial and unjustifiable risk that Plaintiff would suffer severe emotional distress as a result of the treatment of her co-workers. This is an egregious case in which punitive damages are warranted. The Court will hold a hearing to determine the amount of punitive damages at 2:00 p.m. on Thursday, August 28, 2003.

## V. CONCLUSION

For the foregoing reasons, the Court ORDERS Defendant to pay one million four thousand three hundred seventy-four dollars ($1,004,374.00) in front pay and nine hundred fifty thousand dollars ($950,-000.00) in compensatory damages.